825 A.2d 534 (2003)
361 N.J. Super. 281
SECURE HERITAGE, INC., d/b/a Alexanders's Inn; The Abbey of Bayberry Inn, L.L.C.; Buttonwood Bed & Breakfast, Inc., d/b/a Buttonwood Manor; Columbia House; The Inn At Journey's End, L.L.C.; King's Cottage Partnership, d/b/a King's Cottage; Susan and Elan Zingman-Leith Partnership, d/b/a Leith Hall; The Manse Bed & Breakfast; Cape May Management, Inc., d/b/a Marquis De Lafayette; Montreal Inn, Inc.; Mooring, Inc., d/b/a The Mooring; The Primrose Inn; Rubob, Inc., d/b/a Sandpiper Beach Inn; Henry Sawyer Inn; Keystone, Inc., d/b/a Sea Crest Inn; Springside Guesthouse; Velias Seaside Inn; The Victorian Inns, Inc. and The Victorian Look, Plaintiffs-Respondents/Cross-Appellants,
v.
CITY OF CAPE MAY; William G. Gaffney; Jerome E. Inderwies; Dr. Edward J. Mahaney, Jr. and Harry A. Stotz, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 2003.
Decided June 24, 2003.
*538 Michael Gross, Atlantic City, argued the cause for appellants/ cross-respondents (Cooper, Levenson, April, Niedelman & Wagenheim, attorneys; Mr. Gross and Steven D. Scherzer, on the brief).
Edward G. O'Byrne, Totowa, argued the cause for respondents/cross-appellants.
Gilmore & Monahan, Toms River, for amici curiae Borough of Lavallette and Borough of Seaside Heights (Jean L. Cipriani and Michael J. Gilmore, of counsel and on the brief).
Before Judges BRAITHWAITE, LINTNER and PARKER. *535 *536
*537 The opinion of the court was delivered by LINTNER, J.A.D.
Defendants, the City of Cape May (the City) and City Council members, appeal from a portion of a Law Division order granting summary judgment in favor of plaintiffs, various innkeepers doing business in the City. The summary judgment order, dated May 3, 2002, declared the provisions of the City's Ordinance 1214-2000 (the Ordinance) prohibiting individuals from purchasing more than five seasonal beach tags and banning hotels, motels, inns, bed and breakfasts, and other rental units from transferring seasonal beach tags unconstitutional, and declared such tags transferrable. The order also required the City to: (1) maintain complete and accurate records of the revenue generated from its beach tag program, including a separate and distinct "beach tag program" account into which all beach tag revenue is to be deposited and from which all expenses are to be paid, (2) prepare a quarterly analysis and year-end report of the indirect costs of its beach tag program, and (3) publish modifications to an amended ordinance no later than March 30, 2003.
Defendants' cross motion for summary judgment seeking to dismiss plaintiffs' complaint insofar as it challenged the City's 2001 and 2002 budgets was granted, and plaintiffs' application for counsel fees and costs was denied. Plaintiffs cross appeal *539 the order dismissing their challenge to the City's 2002 budget and the denial of counsel fees and costs.
We affirm the order insofar as it declared the provisions of the Ordinance banning the sale and transfer of seasonal beach tags to the lodging industry unconstitutional. We reverse the order insofar as it strikes down the provisions of the Ordinance limiting the sale of seasonal beach tags to five per person. We also reverse and remand for further proceedings those provisions of the order requiring the City to account for all the indirect expenses and maintain a separate bank account into which all beach tag revenue is to be deposited and from which all expenses are to be paid.
The combined procedural history and relevant facts are as follows. Until the mid-twentieth century, beaches in New Jersey were free and open to the public. Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 300, 294 A.2d 47 (1972). In 1955, the Legislature granted municipalities bordering the Atlantic Ocean the authority to charge the public for access to their beaches and bathing facilities.[1]N.J.S.A. 40:61-22.20. In 1977, pursuant to this statute, the City enacted its first beach revenue ordinance, which required users of its beach to purchase "beach tags." The 1977 ordinance provided six categories of beach tags: (1) a seasonal tag ($13 if purchased before May 1 and $16 if purchased thereafter); (2) a weekly tag ($10); (3) a daily tag ($4); (4) a "20th Century" tag (entitling the owner to one seasonal tag annually up to and including the year 2000 for a cost of $100); (5) a three-day tag ($7); and (6) a "decade certificate" (entitling the owner to one seasonal tag annually for a period of ten consecutive years at a cost of $100). That ordinance also provided that the tags, except for the daily tags, could not be "sold or leased or transferred to any person or entity by any one other than the City or its duly authorized representatives."[2]
Despite the prohibition on the transfer of beach tags, plaintiffs purchased large quantities of seasonal beach tags, which they would provide to their guests as amenities for their stay. Such a practice was thought to be necessary for plaintiffs to compete with other seaside resort towns, such as Wildwood and Atlantic City, that did not charge for admission to their beaches. From 1997 to 1999, the City's beach operation ran at a deficit, thus requiring the City to subsidize the operation from its general revenue fund.[3]
According to Luciano V. Corea, City Administrator for the City of Cape May,
[n]otwithstanding a provision prohibiting the transfer of any but daily beach tags, the practice was widespread, and [the] City Council began to question its advisability. In fact, as we approached the 2000 summer season, proposals were made to enforce the non-transferability of various beach tags. However, we received numerous complaints by owners of various hotel, motel and bed and breakfast facilities, who advised us that *540 they had already created and disseminated marketing materials which provided for the use of free beach tags as supplied by those institutions. Those businesses were, quite understandably, concerned that any enforcement of the then existing beach tag ordinance would render their advertisements incorrect.
As a result, in 1999, the City enacted Ordinance 1209-2000 (1999 ordinance), amending the 1977 ordinance to provide two classes of seasonal beach tags: a personal seasonal beach tag and a commercial seasonal tag. The personal seasonal tag was defined as "a beach tag ... for personal use by the purchaser of such beach tag or by any person to whom such beach tag is transferred gratuitously and without consideration, remuneration or other financial benefit, directly or indirectly." A personal seasonal tag cost $13 before May 1 and $17 thereafter, and a limit of ten tags per person was imposed. The commercial seasonal beach tag, which was created as an accommodation to the lodging industry and to increase revenue, was defined as "a beach tag ... for commercial use and which may be transferred by the purchaser for consideration, remuneration or other financial benefit." A commercial seasonal tag cost $22, and there was no limit on the number that could be purchased. The daily, three-day, and weekly beach tags were still available.[4] With the addition of commercial seasonal beach tags for the 2000 season, the City's beach operation deficit shrank to $35,595.
The 1999 ordinance was only in effect for the 2000 bathing season. During the summer of 2000, the City Council conducted hearings concerning the advisability of the commercial seasonal beach tag and the transferability of beach tags. According to Corea,
many owners of hotels, bed and breakfast facilities requested the elimination of the commercial beach tagthese owners simply did not feel that it was right or proper for those establishments to supply beach tags and felt it would be better if those beach tags were purchased by a guest in a [manner] much like most other New Jersey municipalities.
In August 2000, the City enacted the Ordinance to take effect on September 4, 2000, in time for the 2001 bathing season. The Ordinance dropped the commercial seasonal beach tag and limited seasonal tags to personal seasonal beach tags. Section 8-2 of the Ordinance defined "Seasonal Beach Tags" as follows:
"Seasonal beach tag" shall mean a beach tag to use the public beaches in the City of Cape May during a bathing season for personal use by the purchaser of such beach tag or by any person to whom such beach tag is transferred gratuitously and without consideration, remuneration or other financial benefit, directly or indirectly. No more than five (5) seasonal beach tags may be purchased by one (1) person.
Additionally, section 8-7(a) provided:
Seasonal beach tags shall not be sold, leased or transferred for consideration, remuneration or other financial benefit, directly or indirectly, such as, without limitation, for use by hotel, motel, inn, bed and breakfast or other rental unit guests.
As a result of the Ordinance, the lodging industry was effectively precluded from purchasing seasonal beach tags, thereby *541 forcing its guests to buy daily, weekly, three-day or seasonal tags, which, like the general public, they could do by mail or via the Internet. In 2001, for the first time in five years, the City's beach operation ran at a surplus, $109,838.
During discovery, several members of the City Council gave their reasons for voting for the Ordinance. Former Mayor William G. Gaffney testified as follows:
[T]he city council was always trying to obtain the proper funds from the sale of tags to pay for the beach operation. We felt over the years that we were not able to do that, that the taxpayers had to subsidize the beach operation.
....
[S]ome people, council members in particular felt that the sale of tags to the individual tourist on a one-on-one situation with no business transferring tags back and forth, that that particular way of selling tags would generate more income. I can only assume that, I don't know of no [sic] feasibility study that would say you will gain this X number of thousands of dollars more if you don't do it. I can only assume that they were people felt that that would happen and what the numbers are producing right now, as we sit here, the sale of beach tags so far this year [2001] ... I think those numbers will show that by doing it the way we're doing it with this ordinance, it's producing the needed revenue.
Councilmember Edward J. Mahaney, Jr., recalled as follows:
[A] draft [of the Ordinance] was proposed, it was circulated widely throughout the city to find out what people felt of it. And it was truly impressive that every segment thought this was a good compromise and that they could live with it. Okay? I wasn't personally happy with it because I felt we still had a distinction between the residents and the businesses and I voiced that at council meetings that I had great reservations, that I would have preferred that the residents buying seasonal beach tags wouldn't be able to transfer them, even if it was gratuitously, you know, a beach tag was a beach tag and it belonged to that person and I felt that was fair. However, when we had the public hearing on this ordinance, all the special interest groups were there. And they all testified that they were in favor of this and that they thought it was fair and they could live with it, and it was a good way to start. So, in the spirit of cooperation, I voted for it. There was no pressure on me there.
Councilmember Jerome E. Inderwies was asked:
Q. [T]he reason that you voted for the change from [the 1999 ordinance] to [the Ordinance] wasn't just the transfer of a beach tag, but you felt that you want[ed] to prohibit transfer to guests or as an incentive to conduct business?
A. Yes.
Q. Because that's what the statute did?
A. Yes.
....
Q. Was there any other reason that you voted for the change?
A. No.
Q. Was there an economic reason why you voted for the change?
A. Well, we felt thatI guess I felt that the sale of beach tags should pay for the use of theshould pay for the beach maintenance and everything related to it.
Q. ... Did anybody do a feasibility study for you that you would either make or lose money as compared to the *542 old ordinance by the passing of a new one?
A. Yes.
Q. And who did that feasibility study?
A. CFO.
Q. That would be your chief financial officer, Mr. MacLeod?
A. Yes.
Q. And what did Mr. MacLeod advise you?
A. That he felt that the fees they were charging and the budget that he drew up and the money that we collected had to support the beach operation.
....
Well, I guess we did do it for economy purposes.
Q. Okay.
A. We tried to balance it out.
Q. Did anybody give you an economic reason why you would make more money by not selling commercial seasonal beach tags as compared to selling commercial seasonal beach tags?
A. No.
Finally, Councilmember Harry A. Stotz testified as to the reasons he voted to change the ordinance:
Q. So, the complaint was that you sold a beach tag and other people would use it?
A. Yes.
Q. How did you hope to rectify that complaint with the ordinance, change in the law?
....
A. We got rid of the commercial tag.
....
Q. Did you think that the commercial tag was the one that was being transferred over and over again?
A. Yes.
....
Q. Why did you vote to change this previous practice?
A. Because I didn't believe in a commercial tag.
....
The change was made because it's still not fair to have a commercial tag and keep giving it to somebody else each day.
....
I'll give an example of it. If you go to the movies and you buy a ... ticket ... do you come out of the movie and give it to somebody else to go in to see the show?
Q. And that's what you think was happening with beach tags?
A. Oh, I know that's what was happening with them.
....
And I think that's totally wrong. That ticket that's being used, you buy one ticket and you use it a hundred times....
....
[I]t's called greed, and that's the way I feel about it, and I get very hyper and very mad when greed steps into a picture. I'm here for the taxpayer of this city; when I see they're not getting a fair deal, I'm going to do something or try to do something, and all of these people hollering about the beach tags, they can't give a free beach tag, but they can charge 200, 250 a night for a room, that upsets me, because to me, now it's greed.
....
Q. Aren't you really passing on the cost of a daily beach tag to people who come down and rent a hotel room rather than people who just get a room from you, isn't that the distinction?
*543 A. The distinction is that a motel charging 200, and $250.00 a night, or a rooming house or whatever, right, wants to give a free beach tag.
Q. Sure. Does that bother you?
A. Yes.
....
Q. ... Councilman, it's my understanding that if a fellow comes down from Newark and visits one of the residents of this town, and uses that resident's beach tag for free, he's okay; but, if he comes down and goes to one of the hotels and they give him ... the same beach tag, it's not okay; is that correct?
....
What's the difference
A. I'm goingthere's a big difference, I'm going to tell you.
....
I have two people that come to my house, my aunt and uncle, all right? And they come down for a week for the whole summer, so let's say I let them use two beach tags. Now, there's two people, there's not a hundred people; in one hotel, there's a hundred people using it to my two people. Every day, seven days a week, a hundred and some days for the summer, every day they're using that same beach tag, boom, boom, boom, every day.
Larry Muentz, president of Secure Heritage, Inc., submitted a certification demonstrating the effect of the Ordinance on his business and the Cape May lodging industry:
To a reasonable probability, elimination of "commercial seasonal beach tag" sales has been a financial disaster for the hotels, motels, Inns and Bed and Breakfasts of Cape May.
To a reasonable probability, nearly all of the guests to whom I could not provide a beach tag for the 2001 summer season and who had to purchase such tags on their [own] were non-residents of the City of Cape May.
Irreparable harm will be suffered if my hotel is unable to purchase seasonal beach tags for the 2002 season.
Just prior to the 2001 bathing season, on April 24, 2001, plaintiffs filed a complaint in lieu of prerogative writs seeking to invalidate the Ordinance as violative of the Equal Protection Clauses of the Federal and State Constitutions, U.S. Const. amend. XIV, N.J. Const, art. I, ¶ 1, and the public trust doctrine on the basis that it "discriminate[s] against hotels, motels, inns, bed and breakfasts and those who operate rental units, in favor of residents of the City of Cape May and their families in an effort, inter alia, to discriminate against use of the public beaches by non-residents."[5] Plaintiffs also sought to invalidate the City's 2001 budget as violative of the public trust doctrine because it estimated indirect expenses and placed the revenue generated from the sale of beach tags in its general revenue account. Plaintiffs also requested the court to: (1) order a summary investigation into the fiscal affairs of the City; (2) order the appointment of an expert to conduct such investigation; (3) restrain the sale of beach tags until the completion of such investigation; and (4) restrain the payment of any funds derived from the sale of beach tags.
Plaintiffs' order to show cause filed in conjunction with its complaint seeking unspecified injunctive relief was denied.[6] Following discovery, plaintiffs filed their motion for summary judgment and defendants responded with their cross motion.
*544 On April 29, 2002, the judge rendered his oral opinion, which was memorialized in the order of May 3, 2002. Defendants filed their notice of appeal, and on May 13, 2002, we granted their emergent application staying imposition of the Law Division order pending appeal. Plaintiffs filed their cross appeal on May 16, 2002.
On appeal, defendants contend that the prohibition on the transfer of seasonal beach tags by the lodging industry is valid because: (1) it is a rational prohibition related to a legitimate governmental interest; (2) it does not violate the public trust doctrine because seasonal tags are available to all residents and nonresidents at the same prices; and (3) it is authorized by N.J.S.A. 40:61-22.20. Defendants also contend that the motion judge improperly abrogated the City's legislative and budget-making function by declaring seasonal beach tags transferable and not sending the matter back to the City for revision of the Ordinance. Finally, defendants assert that the motion judge erred in finding the City's method of accounting for its beach tag program improper because, by doing so, he placed the burden of proof on defendants and decided a disputed issue of material fact. In their cross appeal, plaintiffs contend that the 2002 City Budget is void because it violates the public trust doctrine and they are entitled to counsel fees and costs. We address these issue seriatim.

I.
We first consider the validity of the Ordinance's ban on the transfer of seasonal beach tags by the lodging industry. Plaintiffs urge that the ban on transferability is contrary to the provisions of N.J.S.A. 40:61-22.20 and violates equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution and conferred by Article 1, Paragraph 1, of the New Jersey Constitution. Defendants take a contrary stance, claiming the prohibition on transferability violates neither statutory nor constitutional provisions.
N.J.S.A. 40:61-22.20, which grants authority to municipalities to charge beach user fees, provides:
The governing body of any municipality bordering on the Atlantic ocean, tidal water bays or rivers which owns or shall acquire, by any deed of dedication or otherwise, lands bordering on the ocean, tidal water bays or rivers, or easement rights therein, for a place of resort for public health and recreation and for other public purposes shall have the exclusive control, government and care thereof and of any boardwalk, bathing and recreational facilities, safeguards and equipment, now or hereafter constructed or provided thereon, and may, by ordinance, make and enforce rules and regulations for the government and policing of such lands, boardwalk, bathing facilities, safeguards and equipment; provided, that such power of control, government, care and policing shall not be construed in any manner to exclude or interfere with the operation of any State law or authority with respect to such lands, property and facilities. Any such municipality may, in order to provide funds to improve, maintain and police the same and to protect the same from erosion, encroachment and damage by sea or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, by ordinance, make and enforce rules and regulations for the government, use, maintenance and policing thereof and provide for the charging and collecting of reasonable fees for the registration of persons using said lands and bathing facilities, for access to the beach and bathing and recreational *545 grounds so provided and for the use of the bathing and recreational facilities, but no such fees shall be charged or collected from children under the age of 12 years; and the municipality may by ordinance provide that no fees, or reduced fees, shall be charged to persons 65 or more years of age and to persons who meet the disability criteria for disability benefits under Title II of the federal Social Security Act (42 U.S.C. § 401 et seq.).

[N.J.S.A. 40:61-22.20]
Plaintiffs contend that the statutory construction doctrine expressio unius est exclusio alterius (the expression of one is the exclusion of the other) prohibits the classification made by the City because the statute "has not specifically afforded [the City] the delegated authority to distinguish between classifications of beach goers." We disagree. Because beach property is held by a political subdivision and the State in trust for the common use of all people, a municipality must not discriminate unfairly among different users of the beach. However, a municipality is permitted to differentiate between beach goers so long as the classification is reasonably related to a proper governmental objective and implemented in a non-discriminatory manner consistent with equal protection and due process. Hyland v. Township of Long Beach, 160 N.J.Super. 201, 206, 389 A.2d 494 (App.Div.), certif. denied, 78 N.J. 395, 396 A.2d 582 (1978). New Jersey courts have repeatedly upheld classifications not specifically authorized by the statute. Neptune City, supra, 61 N.J. at 302, 294 A.2d 47 (upholding portion of fee structure that imposed different fees for seasonal, weekly and daily badges); Hyland, supra, 160 N.J.Super. at 204-08, 389 A.2d 494 (upholding a fee structure that charged a lower rate for seasonal badges if purchased prior to May 31 and that allowed for the purchase of seasonal or weekly badges); Sea Isle City v. Caterina, 123 N.J.Super. 422, 430-31, 303 A.2d 351 (Cape May Cty.1973) (permitting a differential rate for seasonal and weekly badges). We conclude that the strict application of expressio unius est exclusio alterius is inapplicable here.
We turn to the issue of whether the ban on transferability runs afoul of N.J.S.A. 40:61-22.20, because it violates State and federal principles of equal protection and the public trust doctrine. The Fourteenth Amendment to the United States Constitution prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Although the term "equal protection" does not appear in the New Jersey Constitution, Article 1, ¶ 1, has been interpreted as conferring a right analogous to that available under the Fourteenth Amendment. Doe v. Poritz, 142 N.J. 1, 94, 662 A.2d 367 (1995). Indeed, "the right under the State Constitution can in some situations be broader than the right conferred by the Equal Protection Clause." Ibid.
The motion judge relied on two distinct bases to conclude that the provisions in question violated equal protection. First, he found that allowing individuals to transfer beach tags while disallowing the lodging industry from doing the same was not rational, thus arbitrary and a violation of equal protection. Second, he determined that the prohibition on transfer by the lodging industry discriminates against non-residents by imposing on them a higher per diem cost for use of the beach. The judge reasoned as follows:
[F]inally, and not the least important and under the public trust doctrine, actually the most importantMr. Muentz certified, Judge, if not all, certainly the vast majority of our clients are out of town guests. By denying us the right to *546 buy, as we have in the past, seasonal beach tags, in whatever volume we wish, and offer those beach tags ... as an amenity, the [City] is forcing our clients, our customers, our lodging out of town guests to pay a per diem fee to get to this beach beyond what other persons are entitled to pay, at a lesser price. That is discriminatory, in this record.
Essentially, under both the Federal and State Constitutions, equal protection requires that similarly situated individuals be treated alike. Brown v. State, 356 N.J.Super. 71, 79, 811 A.2d 501 (App. Div.2002).
Equal protection claims under the Fourteenth Amendment to the United States Constitution are analyzed under a three tier approach. "A statute that regulates a `fundamental right' or a `suspect class' is subject to `strict scrutiny.'" A statute regulating a "semi-suspect" class or substantially but indirectly affecting a fundamental right will be subject to "intermediate scrutiny." All other statutes are subject to rational basis scrutiny, meaning it must be "rationally related to the achievement of a legitimate state interest."
[Id. at 79, 811 A.2d 501 (quoting Barone v. Dep't of Human Servs., 107 N.J. 355, 364-65, 526 A.2d 1055 (1987)).]
Under the New Jersey Constitution, the "analysis `employ[s] a balancing test' and when `striking the balance,' a court must consider `the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.'" Id. at 79, 811 A.2d 501 (quoting Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985)) (alteration in original). "Statutes carry a strong presumption in favor of constitutionality, and the proponent of invalidity bears the heavy burden of overcoming that presumption." Id. at 79-80, 811 A.2d 501 (citing State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32, 45-46, 590 A.2d 191 (1991); David v. Vesta Co., 45 N.J. 301, 315, 212 A.2d 345 (1965)).
Because the provisions under consideration do not involve a fundamental right[7] and do not discriminate against a "suspect class," we employ the rational basis test. The applicable principles are as follows. The rational basis test mandates upholding legislation if the difference in "treatment is `rationally related to a legitimate state interest.'" In re Regulation of Operator Serv. Providers, 343 N.J.Super. 282, 324, 778 A.2d 546 (App. Div.2001) (quoting City of Cleburne v. Cleburne Living Ctr. Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)). "The equal protection guarantee is offended only if the classification is wholly unrelated to the legislative objective." Id. at 324, 778 A.2d 546. "Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary." Doe, supra, 142 N.J. at 91, 662 A.2d 367. "Distinctions may be made with substantially less than mathematic exactitude, and an adequate factual basis for the legislative judgment is presumed to exist." In re Regulation of Operator Serv. Providers, supra, 343 N.J.Super. at 324, 778 A.2d 546. "[A] heavy burden is placed on the party attacking the classification to show that it clearly lacks a rational relationship to a legitimate state objective." Ibid. "`A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" Barone, supra, 107 *547 N.J. at 367, 526 A.2d 1055 (quoting McGowan v. State of Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399(1961)). In sum,
[t]he rationality commanded by the Equal Protection Clause does not require States to match ... distinctions and the legitimate interests they serve with razor like precision.... [W]hen conducting rational basis review "[a court] will not overturn such [government action] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [it] can only conclude that the [government's] actions were irrational."
[Kimel v. Florida Bd. of Regents, 528 U.S. 62, 83-84, 120 S.Ct. 631, 646, 145 L.Ed.2d 522, 542 (2000) (quoting Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171, 176 (1979)).]
Under the State's balancing test, the governmental interest in the statutory classification is weighed against the interests of the affected class. Sojourner A. v. New Jersey Dep't of Human Servs., 350 N.J.Super. 152, 166-67, 794 A.2d 822 (App.Div.), certif. granted, 174 N.J. 194, 803 A.2d 1165 (2002). Just like the Federal approach, the challenging party has the burden to show the unconstitutionality of the provision at issue. McKenney v. Byrne, 82 N.J. 304, 317, 412 A.2d 1041 (1980). Although the State approach differs analytically from the Federal approach, the two approaches "will often yield the same result." Barone, supra, 107 N.J. at 368, 526 A.2d 1055. "To a large extent," the considerations involved in the State equal protection analysis are implicit in the Federal rational basis test. Ibid. Irrational legislation is similarly barred by the State Constitution. McKenney, supra, 82 N.J. at 317, 412 A.2d 1041. The public trust doctrine, which is premised on the common rights of all citizens to use and enjoy tidal land seaward of the mean high water mark, dictates "that the beach and the ocean must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible." Neptune City, supra, 61 N.J. at 309, 294 A.2d 47.
With these principles in mind, we turn to the arguments on appeal. Defendants first argue that the Ordinance does not discriminate against non-residents of the City. See Neptune City supra, 61 N.J. at 310, 294 A.2d 47. The only evidence in the record that non-residents will be forced to pay a higher per diem rate for use of the beach came from the certification submitted by Larry Muentz, which stated that nearly all the guests of his hotel were nonresidents who had to purchase tags because the hotel could not provide them. Conspicuously absent are certifications from non-residents that their use of the beach would be deterred by the provisions of the Ordinance. Also lacking is any expert testimony that the per diem cost for non-residents is higher than that for residents. Generally, "a heavy burden is placed on the party attacking the classification to show that it clearly lacks a rational relationship to a legitimate state objective." In re Regulation of Operator Serv. Providers, supra, 343 N.J.Super. at 324, 778 A.2d 546. Here, by his ruling, the motion judge mistakenly shifted the burden to the City to show that the Ordinance had a rational basis for discriminating against non-residents.
Moreover, the Ordinance specifically provided that any individual, whether resident or non-resident, is permitted to purchase seasonal beach tags, even providing for sales by mail and over the Internet. Nothing prevents a non-resident, who anticipates staying at a lodging facility in the *548 City, from purchasing a seasonal beach tag for personal use. Because residents and non-residents are treated alike, we conclude that the provisions of the Ordinance banning sale and transferability of seasonal tags to the lodging industry does not discriminate against non-residents nor does it offend the public trust doctrine. Neptune City, supra, 61 N.J. at 310, 294 A.2d 47.
We also conclude that the judge erred in striking down the five-tag limit. The judge provided the following reasons.
There may be some rational basis for five seasonal beach tags purchased per one person, but it's not found in the ordinance and it's not found in the record.... [W]hat's the basis for the five? For exampleand where is the equal protection if ... any one person can purchase no more than five, yet the ordinance doesn't address, for example, mom, dad and the three children over the age of 16 each purchasing five, now you've got 25 beach tags in one house. And you may be precluding someone else who lives in a single family with six bedrooms from purchasing more than five. There's no factual basis in the record for the limitation of five. And as I sit here, I mean I can guess, if you will, well, five may relate to the average nuclear family, mom, dad, three children, orit may. But there's nothing in the ordinance and nothing in the record that establishes a reasonable relationship between the five and some stated aim of the ordinance. And so for that reason, and the inequities that I've cited, I have no choice but to find that the limitation on five seasonal beach tags as well is arbitrary, unreasonable, capricious and, therefore, a denial of equal protection. Actually, it's illusory.
As in his analysis of the non-resident issue, the motion judge improperly shifted the burden to the City to prove the rationality of the Ordinance. Under the rational basis analysis, "an adequate factual basis for the legislative judgment is presumed to exist." In re Regulation of Operator Serv. Providers, supra, 343 N.J.Super. at 324, 778 A.2d 546. Therefore, the City was not required to present any evidence on this issue, and plaintiffs presented no evidence of the irrationality of the five tags per person limit, thus failing to meet their heavy burden. Furthermore, any conceivable rationale suffices to uphold the legislation. Barone, supra, 107 N.J. at 367, 526 A.2d 1055. Thus, the motion judge's proffered rationale, that "five may relate to the average nuclear family," was sufficient to justify the five tag limit.
We next consider plaintiffs' contention that the ban on transferability impermissibly discriminates against them under the rational basis test. Finding that the ban on transferability was not rational, the motion judge reasoned:
What is a beach tag license? What is a beach tag? Is it a license? And if it's a license, is it a license which flows only to the specific person who purchases it? And if so, what in that contract, between the City and purchaser of the beach tag, ties that purchaser to that tag? Or that purchaser to those five tags, which is the maximum permitted under this ordinance? Nothing. And because there is, at least in this record, no specific identifying information required by the City when it sells between one and five tags to a person qualified under this ordinance, the tag as a license becomes really a bearer license. And the ordinance contemplates the bearer nature of that license. How do we know that? Well, if you're not a hotel, motel, inn, bed and breakfast or other rental unit, and still a person, you can walk down to the beach *549 tag office and buy your five. And by the way, unless the person selling the beach tags knows your particular family and who's in it and how old you are, everyone else in your family ... can walk in and ask for his or her or their own five. Which means, for example, if you're the family of say two parents and three children ... you're going to qualify in your family for 25 beach tags. Which this ordinance allows you to transfer without limitation. Transfer to whom? To anyone to whom you elect to give the bearer license, because there's no restriction against that. In fact, the ordinance affirmatively authorizes that. And that family of five, with their 25 beach tags, can then, if not regulated by the City, turn around and rent their home on a weekly basis. And what do we have within the permissible language of the ordinance, the very thing that Councilman Stotz testifies under oath he was out to stop. While, at the same time, the ... lodging industry, including hotels, motels, inns, bed and breakfasts or other rental units, are being denied the right to purchase as those entities, or as any one of those entities, a single beach tag. That is unequal treatment and, therefore, undeniably a violation of equal protection.... [T]ags are permitted to be sold to any individual other than principals, agents of hotels, motels, inns, bed and breakfasts or other rental unit guests. So the ordinance itself, in my view, discriminates against those commercial uses.
We agree essentially with the judge's analysis that the distinction in the Ordinance respecting transferability between the lodging industry and the general public is arbitrary. The two stated purposes for the provision against transferability are (1) to raise sufficient revenue to cover the cost of the beach operation; and (2) to place the cost of running the beach on those who use the beach. While these objectives are legitimate, they are not achieved by restricting the lodging industry from transferring beach tags while at the same time permitting transfer by the general public. See, e.g., State v. Churchdale Leasing, Inc., 115 N.J. 83, 110, 557 A.2d 277 (1989); Chevron U.S.A., Inc. v. City of Perth Amboy, 9 N.J.Tax 205, 225 (1987) (finding that raising revenue and distributing the cost of government are legitimate State objectives).
The approach here lacks rationality when one considers that the reason for the ban on transfer by commercial lodging enterprises is to increase income in order to support the beach operation. Under the Ordinance, individuals can transfer as many as five tags each day, thus the economic benefit gained by the City is diluted by the number of seasonal tags purchased. A family of five can legitimately obtain twenty-five beach tags and transfer them gratuitously to whomever they wish. That family could have guests come in from out-of-town every week and give those guests their beach tags. The ban not only militates against increasing income but also is unfair to plaintiffs who seek to provide an accommodation to their guests, while private individuals may purchase and transfer five seasonal tags to whomever they desire. We conclude that sections 8-2 and 8-7(a) of the Ordinance insofar as those sections ban the sale of seasonal beach tags to hotels, motels, inns, bed and breakfasts and other rental unit guests, but permit individuals to purchase transferable seasonal beach tags are not rationally related to the legislative intent and violate both the Federal and State Constitutions.

II.
Defendants assert that the motion judge improperly abrogated the City's legislative *550 function by declaring seasonal beach tags transferable and not sending the matter back to the City to revise the Ordinance to comply with his findings. Our May 3, 2002 stay of the judge's order renders defendants' contention moot. Moreover, at oral argument before us, the parties confirmed that during the pendency of this appeal the Ordinance was amended to ban the sale, lease, and transfer of seasonal beach tags.[8]

III.
We consider next those findings that impact on the administration of the City's budget, specifically the provisions of the summary judgment order requiring the City to maintain a separate account reflecting beach tag revenue deposits and expenses paid, and the denial of plaintiffs' challenge seeking to void the City's 2002 budget as violative of the public trust doctrine. As previously stated, the City contends that the judge erred in requiring it to maintain a separate beach tag bank account. Plaintiffs counter that depositing beach tag revenue into and paying all beach operation expenses from the City's general account is a violation of the public trust doctrine and, therefore, the judge should have voided the 2002 municipal budget.
At the outset we note that our stay of the judge's order renders moot plaintiffs' cross-appeal of the judge's denial of their request to have the City's budget for fiscal 2002 declared void because the 2002 budget has been fully implemented. We need only consider that portion of the judge's order requiring the City to maintain a separate account pursuant to the public trust doctrine.
In support of its position, plaintiffs presented a report prepared by Gerard Stankiewicz, CPA, which found that:
Based on the direction that the [c]ourt gave in Slocum v. Belmar and indications by the State of New Jersey Department of Treasury Budget Review Team, it is my opinion that, in order to properly account for the finances of a beachfront operation, a separate Beachfront Utility Fund should exist in the City of Cape May.... The system internally for the expenses would have to be developed based upon input from various department heads, review of time sheets for allocation of time and, in some cases, direct or indirect allocation of other expenses.
At deposition, however, Stankiewicz testified that he did not believe a detailed analysis of time records was required for the municipality to determine indirect expenses. He "imagined" that the department heads should have some type of information regarding the time spent by subordinates on a particular function.
Plaintiffs also presented a January 2001 Department of the Treasury budget review of the City, which made the following observations:

*551 Based on a review of the beachfront operations report prepared by the city, the team believes that the city is not keeping sufficiently detailed financial records of beachfront operations and is employing estimates in the allocation of cost to the beachfront. Reliance on estimates in determining the cost of beachfront operations and subsequently the price of beach tags is a flawed approach exposing the city to criticism and possible litigation.
With the above observations in mind, the budget review team recommended
that the city take the necessary steps to comply with the Slocum v. Belmar ruling concerning the proper determination of cost for beachfront operations. The Slocum decision provides for 30 separate categories of eligible costs that can be allocated to a beachfront operation. Adhering to the cost guidelines established in this decision would insure that the city is charging a "reasonable" fee for beach tags.
The team recommends that the city immediately establish an accounting system that will track the cost of beachfront operations. The team considers the existing beachfront operation cost report to be inadequate since it appears to rely on estimates and educated guesses rather than actual accounting data. This will require the creation of a cost accounting system that will record all eligible beachfront expenditures. In addition, the CFO/Treasurer will need the cooperation and assistance of all municipal departments to determine actual city resources being devoted to beachfront operations.
According to the City's Chief Financial Officer, Bruce MacLeod, the City broke down its beach operation into direct and indirect expenses for its fiscal year 2001 budget. The direct expenses were estimated to be $965,908 and included: salaries, wages and benefits for lifeguards and beach taggers; operating expenses for lifeguards and beach taggers; public works salaries, wages, operating expenses, and water/sewer department operating expenses; beach equipment and facilities; insurance; and expenses related to the beach fill program and jetty maintenance.[9]
Indirect expenses were estimated to be $155,000 and included: the percentage of the salaries and wages for City employees, such as employees of the clerk's office and the finance and collection department, the mayor, and the administrator, devoted to beach operation; the percentage of the salaries and wages for public safety employees, such as police officers, fire fighters, and EMT workers, devoted to handling calls from the beach; and other professional services conducted by the City's auditor, engineer, and legal counsel. Because detailed time records were not kept respecting the specific time allocated to these part-time beach operations, the indirect expenses were not exact but rather estimated by MacLeod based upon his discussions with heads of the respective departments. In a certification, MacLeod asserted that the Local Government budget review was initiated at the City's request, and that the reports issued are for informational purposes only, not binding. He also indicated that the City is audited annually by an independent accounting firm and its budget has been submitted and approved by the State Division of Local Government Services in accordance with statute, N.J.S.A. 40:14B-66.
The City also retained a CPA, Leon P. Costello, who refuted Stankiewicz's report, stating:

*552 There is no statutory requirement to establish and maintain a Beachfront Utility [Fund]. It is acceptable to record revenues and expenditures from this type of operation in the City's Current Fund.... [A]lthough there is a requirement to maintain separate accounting records for Beach Fees, there is no requirement to maintain a separate bank account for them. The City identifies all items of deposit as to their source in compliance with statutory accounting requirements.
....
[T]he State Treasury Budget Review Team recommends ... "adhering to the costs guideline established in [Slocum] would ensure that the City is charging a `reasonable' fee for beach tags.["] The Budget Review Team did not recommend that a separate utility fund be established. The Budget Review Team is stating that the City is to charge a reasonable fee for the use of the beach. Additionally, cost accounting system ... does not constitute a separate utility. There are two negatives associated with the establishment of a separate utility. First, any shortfall in a municipal utility would be raised as an appropriation in the Current Fund Budget. This would have occurred in many of the past several years. Such an appropriation is funded with tax dollars. Secondly, there is significantly more unnecessary paperwork for a utility fund of this type, as opposed to maintaining a cost accounting system as reported by the Budget Review Team.
Finding that the methodology used by the City in calculating the indirect expenses ran afoul of Slocum v. Borough of Belmar, 238 N.J.Super. 179, 569 A.2d 312 (Law Div.1989), and the public trust doctrine, the motion judge stated:
I've reviewed the testimony of Stankiewicz who indicated that yes, guesstimates may be enough.... The guesstimates [of indirect expenses] are MacLeod's, based upon his conversation with somebody else, presumably department heads in those five indirect cost departments. That is not enough competent evidence, in my view, to sustain a Slocum charge to the City's current methodology.... [B]y commingling the revenues with other municipal revenues... the tracing of the revenues becomes more difficult. Tracing of the costs becomes more difficult. It certainly doesn't occur in a vacuum. Treatment of surpluses on an annual basis suddenly no longer becomes profit or loss to the City, but, if excess revenues, becomes potentially a capital reserve for the following year.... For example, [if] the imaginary senior citizen ... walk[s] in and say[s] ... [w]here did our surplus last year go to? Show me how it reduced this year's operating expense budget. I haven't seen anything before me that establishes how the excess of revenue over costs is applied in a fashion consistent with Slocum and more so than Slocum, consistent with trust law in the State of New Jersey and the Avon decision. And so while I am immensely concerned about rendering a decision short of concluding that a separate accounting system must be maintained, I'm not able to find any other option that I could consider properly, as I've evaluated the case.
....
I have no choice but to conclude that the City has, for the reasons indicated, not complied with its affirmative obligations under [N.J.S.A. 40:61:22.20] and Neptune v. Avon. And that it hereafter commence the process of maintaining, first, complete, accurate, traceable records *553 documenting costs relative to beach front facilities. A separate beach account and separate accounting system.
The public trust doctrine dictates that trust lands must be "held, protected, and regulated for the common use and benefit." Arnold v. Mundy, 6 N.J.L. 1, 71 (1821). In Slocum, the trial judge found that, because these lands are held in trust for the public, municipalities have a duty to take special care to account for all costs and revenue related to the beach operation. Although we agree with Slocum that this approach is consistent with the duties of a trustee in other contexts, see Restatement (Second) of Trusts §§ 169 to 185 (1959); see also Coffey v. Coffey, 286 N.J.Super. 42, 668 A.2d 76 (App.Div.1995), certif. denied, 144 N.J. 172, 675 A.2d 1121 (1996), we cannot agree, on this record, that plaintiffs proved that the City's accounting methodology was inappropriate or a violation of law. The facts in Slocum were developed after eight days of trial that included the testimony of six experts. Here, by contrast, the judge made a summary determination based upon the reading of depositions and conflicting expert reports. Generally, summary judgment is not appropriate where there are differing expert opinions. Rubanick v. Witco Chem. Corp., 125 N.J. 421, 440-41, 593 A.2d 733 (1991).
Moreover, we are not convinced that Slocum should be read, as plaintiffs demand, to require a municipality to maintain a separate account for beach tag revenue in all cases. Slocum provides an example of a remedy that may be used in a case where serious accounting irregularities have been proven. The nature of the remedy is necessarily dependent on the severity of the irregularities uncovered. Here, the dispute centered only upon the indirect expenses, not the revenue generated or the direct expenses paid. The motion judge mistakenly found that the creation of a separate account was the only way to ensure that the City could appropriately account for its beach tag revenue. Before passing on such a remedy, it was incumbent on the judge to determine, after assessing the credibility of the witnesses, whether estimates were the only viable means of allocating the costs of each particular type of indirect expense or whether they are capable of actually being accounted for by time and costs. After deciding these issues, the judge should then have determined whether the general municipal account could be used to track the total revenue received, and the direct and indirect costs expended, thereby generating a year-end figure, whether a deficit or surplus, that could be carried forward to the subsequent year's beach tag budget. If it is determined that the accounting method utilizing the general fund can ensure that a surplus in the beach operation budget is not spent on purposes other than beach operation as required by Neptune City, supra, 61 N.J. at 311, 294 A.2d 47, then there would be no need for a separate account.

IV.
Lastly, we consider and reject plaintiffs' assertion that they are entitled to counsel fees. Courts are without authority to award attorney's fees in the absence of a statute or rule. R. 4:42-9(a)(7), (8); see also Community Realty Mgmt. v. Harris, 155 N.J. 212, 235-36, 714 A.2d 282 (1998). Plaintiffs contend that they are entitled to counsel fees because they brought suit to benefit the public and are entitled to be reimbursed for the cost *554 of their suit. They cite no rule or statute that supports this contention.[10]
Secondly, plaintiffs argue that they are entitled to fees because they brought suit to vindicate an encroachment on their constitutional rights. However, plaintiffs' complaint did not allege a civil rights action, such as 42 U.S.C.A. § 1983, under which they would be entitled to counsel fees under 42 U.S.C.A. § 1988(b). Clark v. Bd. of Educ., 907 F.Supp. 826, 829 (D.N.J.1995). Moreover, plaintiffs' claim cannot be construed as a § 1983 claim because it is not based in tort. Freeman v. State, 347 N.J.Super. 11, 21, 788 A.2d 867 (App.Div.), certif. denied, 172 N.J. 178, 796 A.2d 895 (2002).

V.
We conclude that sections 8-2 and 8-7(a) of the Ordinance, insofar as they ban the sale of seasonal beach tags to hotels, motels, inns, bed and breakfasts, and other rental unit guests, but permit individuals to purchase transferable seasonal beach tags, do not pass constitutional muster. We affirm the order for summary judgment insofar as it declared the provisions of the Ordinance banning the sale and transfer of seasonal beach tags to the lodging industry unconstitutional. We reverse the order insofar as it strikes down the provisions of the Ordinance limiting the sale of seasonal beach tags to five per individual. We also reverse and remand for further proceedings, consistent with this opinion, those provisions of the order requiring the City to account for all its indirect expenses and maintain a separate bank account into which beach tag revenue is to be deposited and from which all expenses are to be paid. Finally, we affirm the order denying counsel fees to plaintiffs.
Affirmed in part, reversed and remanded in part.
NOTES
[1] The original statute precluded the collection of fees from persons under twelve years of age. By amendment in 1992, the Legislature provided that a municipality may eliminate or reduce fees for persons over the age of sixty-five and for persons who meet the criteria for disability benefits under Title II of the Social Security Act, 42 U.S.C.A. §§ 401 to 434. L. 1992, c. 195, § 1.
[2] Additionally, the "20th Century" tag could be sold, bequeathed, or otherwise transferred.
[3] The City's beach operation lost $118,273 in 1997, $93,806 in 1998, and $112,461 in 1999.
[4] The price for a weekly tag was increased to $11 and the price for a three-day tag was increased to $8.
[5] The City decided not to contest plaintiffs' standing to assert the rights of non-residents.
[6] A copy of the order to show cause is not included in the record on appeal.
[7] The fundamental right to travel is not implicated here because that tenet only precludes a state from interfering with interstate travel. See Saenz v. Roe, 526 U.S. 489, 500-01, 119 S.Ct. 1518, 1525, 143 L.Ed.2d 689, 702-03 (1999).
[8] Ordinance No. 1287-2003 became effective March 10, 2003, and amended Subsection 8-7(a) to provide:

No privilege, right, badge, permit or other evidence to use the beaches of the City issued to or to be issued upon payment of any of the fees provided for by this chapter shall be sold, leased or otherwise transferred to any person or entity by any one other than the City or its duly authorized representatives. However, daily beach tags... may be transferred from person to person provided no special or separate charge is made for such transfer or use. Specifically, the City or its duly authorized representatives shall be the sole and exclusive vendor and/or lessor of the privileges, rights, badges or permits as it is hereby deemed unlawful for any person or entity to purchase or lease the badges from any one other than the City or its duly authorized representatives.
[9] Plaintiffs do not challenge the City's accounting of direct expenses.
[10] While not available in time for this litigation, the Civil Practice Committee is considering a new rule that would provide counsel fees in "a civil proceeding that results in the establishment, protection or enforcement of a right under the New Jersey Constitution." Fee Shifting in Public Interest Litigation-Public Hearing (April 7, 2003), available at http://home.aoc.judiciary.state.nj.us/notices/n030408a.htm.