902 A.2d 944

NEW JERSEY STATE BAR ASSOCIATION, A NOT-FOR-PROFIT CORPORATION, AND PEGGY SHEAHAN KNEE, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. STATE OF NEW JERSEY, JOHN E. MCCORMAC, IN HIS OFFICIAL CAPACITY AS TREASURER OF THE STATE OF NEW JERSEY, HOLLY C. BAKKE, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE DEPARTMENT OF BANKING AND INSURANCE; AND FRED M. JACOBS, M.D., IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF HEALTH AND SENIOR SERVICES, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 5, 2006—Decided July 26, 2006.

26

28

30

34

Before Judges WEFING, WECKER and FUENTES.

*Edwin J. McCreedy,* argued the cause for appellants (*McCreedy & Cox,* attorneys; *Sharon A. Balsamo, James P. Condon,* and *Charles J. Hollenbeck,* on the brief).

*Patrick DeAlmeida,* Assistant Attorney General, argued the cause for respondents (*Zulima V. Farber,* Attorney General, attorney; *Mr. DeAlmeida,* of counsel; *Marlene G. Brown,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

On June 7, 2004, the Legislature passed and the Governor signed into law the New Jersey Medical Care Access and Responsibility and Patients First Act, *L.* 2004, *c.* 17. On January 3, 2005, plaintiffs New Jersey State Bar Association and Peggy Sheahan

Knee, an attorney licensed to practice law in New Jersey, filed suit challenging the constitutionality of this statute. They named as defendants the State of New Jersey, John E. McCormac, the then-Treasurer of the State of New Jersey, Holly C. Bakke, the then-Commissioner of the Department of Banking and Insurance, and Fred M. Jacobs, M.D., the then-Acting Commissioner of Health and Senior Services. Following a period of limited discovery, the matter was presented to the trial court on cross-motions for summary judgment. Plaintiffs appeal from the trial court's order granting summary judgment to defendants. After reviewing the record in light of the contentions on appeal, we affirm.

The preamble to the bill states:

a. One of the most vital interests of the State is to ensure that high-quality health care continues to be available in this State and that the residents of this State continue to have access to a full spectrum of health care providers, including highly trained physicians in all specialties;

b. The State's health care system and its residents' access to health care providers are threatened by a dramatic escalation in medical malpractice liability insurance premiums, which is creating a crisis of affordability in the purchase of necessary liability coverage for our health care providers;

c. One particularly alarming result of rising premiums is that there are increasing reports of doctors retiring or moving to other states where insurance premiums are lower, dropping high-risk patients and procedures, and practicing defensive medicine in a manner that may significantly increase the cost of health care for all our citizens;

d. The reasons for the steep increases in the cost of medical malpractice liability insurance are complex and involve issues related to: the State's tort liability system; the State's health care system, which includes issues related to patient safety and medical error reporting; and the State's regulation and requirements concerning medical malpractice liability insurers;

e. It is necessary and appropriate for the State to take meaningful and prompt action to address the various interrelated aspects of these issues that are impacted by, or impact on, the State's health care system; and

f. To that end, this act provides for a comprehensive set of reforms affecting the State's tort liability system, health care system and medical malpractice liability insurance carriers to ensure that health care services continue to be available and accessible to residents of the State and to enhance patient safety at health care facilities.

[*L.* 2004, *c.* 17, § 2.]

The bill itself is extensive and contains numerous provisions aimed at alleviating the crisis in medical professional liability

insurance that the Legislature perceived. Only four aspects of the Act, which we summarize below, are implicated in this appeal, however.

Section 27 of the Act establishes the Medical Malpractice Liability Insurance Premium Assistance Fund within the Department of the Treasury and subsection (b) of § 27 creates a revenue source for the Fund. Subparagraph (6) of subsection (b) directs "an annual fee of $75 to be assessed by the State Treasurer and payable by each person licensed to practice law in this State, for deposit into the fund." *L.* 2004, *c.* 17, § 27(b)(6).

The Act exempts attorneys in the following categories from this assessment:

1) those who are barred by statute or constitution from practicing law;

2) those who do not maintain a bona fide office in New Jersey for the practice of law;

3) those who are completely retired from practicing law;

4) those who are on full-time duty with either the armed forces, VISTA or the Peace Corps and are not engaged in practicing law;

5) those who are ineligible to practice in New Jersey by reason of not having made their required payment to the New Jersey Lawyers' Fund for Client Protection; and

6) those who have not practiced law for at least one year. *L.* 2004, *c.* 17, § 27(6).

The sums collected pursuant to this assessment upon attorneys are to be deposited into the fund and combined with the other sums assessed by the statute, which include a $3 annual surcharge per employee for all employers subject to New Jersey's unemployment compensation law and a $75 annual charge upon every physician, podiatrist, chiropractor, dentist and optometrist licensed in New Jersey. *L.* 2004, *c.* 17, § 27(b)(1)-(5).

Further, the statute provides with specificity how the monies in the Fund are to be allocated and spent. It directs that $17 million

annually shall be directed toward providing relief to health care providers in paying medical malpractice liability insurance premiums; $6.9 million annually shall be used for payments to hospitals for charity care subsidies; $1 million shall be directed to reimburse obstetricians and gynecologists for expenses in paying off student loans; and $1.2 million shall be paid to the Division of Medical Assistance and Health Services for the health care of low-income pregnant women. *L.* 2004, *c.* 17, § 27(e).

Further, the Act directs judges who are presiding over medical malpractice actions to determine within thirty days of the discovery end date whether referring the matter for complementary dispute resolution would encourage an early disposition or settlement. *L.* 2004, *c.* 17, § 5. If the judge concludes that it would, the Act directs that the matter be referred to complementary dispute resolution in accordance with *R.* 1:40. *Ibid.*

Additionally, the Act provides a new mechanism by which a health care provider may seek dismissal of a malpractice action in which that individual has been named a defendant. *L.* 2004, *c.* 17, § 6. Section 6(a) of the Act directs that if the health care provider files an affidavit of non-involvement with the court, the action shall be dismissed as to that person. The affidavit of non-involvement must:

> set forth, with particularity, the facts that demonstrate that the provider was misidentified or otherwise not involved, individually or through its servants or employees, in the care and treatment of the claimant, and was not obligated, either individually or through its servants or employees, in the care and treatment of the claimant, and was not obligated, either individually or through its servants or employees, to provide for the care and treatment of the claimant, and could not have caused the alleged malpractice, either individually or through its servants or employees, in any way.
>
> [*L.* 2004, *c.* 17, § 6(a).]

That dismissal, however, is not conclusive. Either a claimant or a co-defendant may file a motion with the court together with an affidavit that contradicts the affidavit of non-involvement filed by the health care provider. *L.* 2004, *c.* 17, § 6(b). If the court determines that the health care provider's affidavit of non-involvement was false or inaccurate, the claim against the provider shall

be immediately reinstated, without regard to any intervening period of limitations. *L.* 2004, *c.* 17, § 6(c).

Section 7 of the Act is the last provision which is challenged before us. It sets forth in great detail the qualifications which must be possessed by an individual who is proffered to give expert testimony in a medical malpractice action or to execute an affidavit of merit pursuant to *N.J.S.A.* 2A:53A–26. *L.* 2004, *c.* 17, § 7. If the party against whom or on whose behalf the proposed expert is testifying is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and if the care or treatment at issue in the action involves that specialty or subspecialty, then the proposed expert must have specialized at the time of the occurrence in that same specialty or subspecialty. *L.* 2004, *c.* 17, § 7(a). Further, if the party against whom or on whose behalf the proposed expert is testifying is board certified and the care or treatment at issue involves that board specialty or subspecialty, the proposed expert witness must either be credentialed by a hospital to handle the treatment or procedure in question or be board certified in the same specialty and during the year immediately prior to the occurrence in question, have devoted a majority of his or her professional time to either active clinical practice in that area or teaching in that area in an accredited medical school. *Ibid.* Additionally, if the party against whom the proposed expert is to testify is a general practitioner, the proposed expert witness must have devoted a majority of his professional time in the year immediately prior to the occurrence in question to active relevant clinical practice or to relevant teaching in that area. *L.* 2004, *c.* 17, § 7(b).

Finally, the Act does contain a method by which a party may seek to be relieved of these strictures: the party may file a motion, demonstrating that it has made a good faith effort to identify an expert in the same specialty or subspecialty and that its proposed expert "possesses sufficient training, experience and knowledge to provide the testimony as a result of active involve-

ment in, or full-time teaching of, medicine in the applicable area of practice or a related field of medicine." *L.* 2004, *c.* 17, § 7(c).

Plaintiffs argued to the trial court that these provisions, §§ 27(5), (6) and (7), of the Act were unconstitutional. The trial court rejected that argument in a thorough opinion. *N.J. State Bar Ass'n v. McCormac,* 382 *N.J.Super.* 284, 888 *A.*2d 526 (Ch. Div.2005). On appeal, plaintiffs maintain that the trial court applied the incorrect standard to their equal protection argument, that the Act violates the separation of powers doctrine because it conflicts with certain rules governing practice and procedure in our courts, that the Act amounts to special legislation and is thus unconstitutional, and that the Act improperly directs the expenditure of funds for a private purpose, with no concomitant public benefit. We shall address these arguments in turn.

## I.

The Fourteenth Amendment to the United States Constitution provides that:

[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[*U.S. Const.* amend. XIV, § 1.]

Similarly, the New Jersey Constitution provides, "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." *N.J. Const.* art. I, ¶ 1. Although the New Jersey Constitution does not expressly use the words "equal protection," it is recognized that this expansive language guarantees the fundamental constitutional right to equal protection of the law. *Caviglia v. Royal Tours of Am.,* 178 *N.J.* 460, 472, 842 *A.*2d 125 (2004) (holding it was not a violation of equal protection for Legislature to bar an uninsured motorist from suing for noneconomic damages); see also *N.J. State Bar Ass'n v. Berman,* 11 *N.J.Tax* 433,

450 (1991), *aff'd in part,* 259 *N.J.Super.* 137, 611 *A.*2d 1119 (App.Div.1992) (stating "[e]qual protection is implicitly guaranteed by our State Constitution"). Like its federal counterpart, art. I, ¶ 1 of our State constitution " 'seeks to protect against injustice and against the unequal treatment of those who should be treated alike.' " *Barone v. Dep't of Human Servs.,* 107 *N.J.* 355, 367, 526 *A.*2d 1055 (1987) (holding it was not a violation of equal protection for the State to condition eligibility for participation in benefits under the Pharmaceutical Assistance to the Aged and Disabled Act for individuals under the age of sixty-five upon receipt of social security disability benefits) (quoting *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985)).

There is a three-tier approach to analyzing equal protection claims asserted under the Federal Constitution. If the statute under consideration implicates a fundamental right or a suspect class, it is subject to strict judicial scrutiny. *Sojourner v. N.J. Dep't of Human Servs.,* 177 *N.J.* 318, 330, 828 *A.*2d 306 (holding statute setting cap in the amount of cash assistance for families at the level set when the family enters the State welfare system did not violate equal protection) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 *U.S.* 432, 440, 105 *S.Ct.* 3249, 3254, 87 *L.Ed.*2d 313, 320 (1985)). Where a statute "regulates a 'semi-suspect' class or substantially affects a fundamental right in an indirect manner," the statute is subject to intermediate scrutiny. *Barone, supra,* 107 *N.J.* at 365, 526 *A.*2d 1055. All other statutes are subject to rational basis review, under which a court must determine whether the statute is " 'rationally related to legitimate government interests.' " *Sojourner, supra,* 177 *N.J.* at 330, 828 *A.*2d 306 (quoting *Washington v. Glucksberg,* 521 *U.S.* 702, 728, 117 *S.Ct.* 2258, 2271, 138 *L.Ed.*2d 772, 792 (1997)).

Our New Jersey Constitution does not mirror the Federal Constitution, and we employ a more flexible approach in considering equal protection arguments under our own constitution. *Caviglia, supra,* 178 *N.J.* at 479, 842 *A.*2d 125 (noting that "under our State Constitution, we apply a flexible balancing test

that weighs the nature of the right, the extent of the governmental restriction on that right, and whether the restriction is in the public interest").

> The crucial issue in each case is whether there is an appropriate governmental interest suitably furthered by the differential treatment involved. In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.
>
> [*Barone, supra,* 107 *N.J.* at 368, 526 *A.2d* 1055 (internal quotations and citations omitted).]

■ Plaintiffs assert that § 27 of the Act, by assessing a $75 charge on attorneys licensed to practice in New Jersey, runs afoul of equal protection principles. We disagree, whether the matter is viewed through the prism of the Fourteenth Amendment's tiered analysis or through New Jersey's flexible balancing test.

It is clear, and the parties agree, that for federal purposes, the Act does not implicate either a fundamental right or a suspect class. Thus, the statute should be reviewed in terms of the rational basis test.

■ A statute withstands analysis under the rational basis test if it is " 'rationally related to a legitimate state interest.' " *Secure Heritage, Inc. v. City of Cape May,* 361 *N.J.Super.* 281, 300, 825 *A.2d* 534 (App.Div.) (quoting *In re Regulation of Operator Serv. Providers,* 343 *N.J.Super.* 282, 324, 778 *A.2d* 546 (App. Div.2001)) (striking down as a violation of equal protection an ordinance banning the sale of seasonal beach tags to rental units while permitting individuals to purchase transferable beach tags), *certif. denied,* 178 *N.J.* 32, 834 *A.2d* 405 (2003). The equal protection clause does not preclude all statutory distinctions based upon classifications; it requires only that the classifications be related to the legislative objective and not be arbitrary. *Ibid.* " 'Imperfect classifications that are part of a reasonable legislative scheme do not violate the equal protection clause.' " *Brown v. Twp. of Old Bridge,* 319 *N.J.Super.* 476, 507, 725 *A.2d* 1154 (App.Div.) (holding that statute limiting compensation for police officers disabled due to injuries received in the line of duty did not

violate equal protection for not addressing those injured while off-duty), *certif. denied,* 162 *N.J.* 131, 741 *A.*2d 99 (1999) (quoting *Murphy v. Allstate Ins. Co.,* 252 *N.J.Super.* 280, 286, 599 *A.*2d 916 (App.Div.1991)).

> [T]he Legislature has wide discretion in determining the perimeters of a classification, distinctions may be made with substantially less than mathematical exactitude, and an adequate factual basis for the legislative judgment is presumed to exist. We must also be mindful of the strong presumption in favor of constitutionality, and the traditional judicial reluctance to declare a statute void, a power to be delicately exercised unless the statute is clearly repugnant to the Constitution.
>
> [*Barone, supra,* 107 *N.J.* at 369–70, 526 *A.*2d 1055 (internal citations omitted).]

In light of that strong presumption, a party challenging the constitutionality of a statute bears a heavy burden to show that the statute is not rationally related to a legitimate state objective. *Secure Heritage, supra,* 361 *N.J.Super.* at 300, 825 *A.*2d 534.

Although, as we have noted, consideration of an equal protection claim under New Jersey's balancing test differs analytically from the rational basis test, "the two approaches are substantially the same and will often yield the same result." *Brown v. State,* 356 *N.J.Super.* 71, 79, 811 *A.*2d 501 (App.Div.2002) (citations omitted) (holding that a statute providing higher accidental disability retirement benefits to police officers who retired on or after April 1, 1991, did not violate equal protection with respect to those who retired prior to that date). Further, when a court is faced with a challenge to a statute based upon an equal protection claim, it should not consider the efficacy or wisdom of the statute. *Id.* at 80, 811 *A.*2d 501. This is so because " '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' " *Brown, supra,* 319 *N.J.Super.* at 506, 725 *A.*2d 1154 (quoting *Bowen v. Gilliard,* 483 *U.S.* 587, 601, 107 *S.Ct.* 3008, 3017, 97 *L.Ed.*2d 485, 501 (1987)).

These principles are illustrated in *Berman, supra,* in which this court rejected a challenge by plaintiff Bar Association to that portion of the Fair Automobile Insurance Reform Act of 1990 ("FAIR") that imposed an annual fee of $100 upon "each person

licensed to practice law in this State who has engaged in the practice of law for at least one year." *Berman, supra,* 11 *N.J. Tax* at 438–39. The purpose of the assessment, combined with the other assessments imposed by FAIR, was to create a revenue source to retire the debt that had been accumulated by the Joint Underwriting Association. *Id.* at 438. The Bar Association challenged that assessment on equal protection grounds, *id.* at 439, as it challenges the assessment now before us. We rejected the contention that the assessment was vulnerable for being both under-inclusive and over-inclusive. *Id.* at 447–49. We agreed with the views expressed by the Tax Court judge that the statute was not unconstitutional because it did not impose a similar assessment upon all who may have benefited from the existence of the JUA. *Id.* at 447. We also noted that "[t]he fact that some members of the burdened class [did] not benefit from the [JUA] system [was] not sufficient to render the classification arbitrary." *Ibid.*

We are not persuaded by plaintiffs' attempts to distinguish this matter from *Berman.* Plaintiffs point, by way of example, to the Act's exemption of attorneys who do not maintain a bona fide office in New Jersey for the practice of law. They point out that the result is to exempt from the assessment an attorney admitted in both Pennsylvania and New Jersey who practices in both states but whose office is located in Pennsylvania.

This result flows from the historical fact that at the time the Act was drafted, *R.* 1:21–1 required that attorneys practicing in New Jersey maintain a bona fide office for the practice of law in this State. While the legislation was under consideration, this rule was amended to drop the requirement that an attorney maintain a bona fide office in New Jersey. We cannot deem the classifications adopted by the Legislature in the Act to be arbitrary because they may not be defined with scientific precision or because they may not reflect subsequent developments.

Plaintiffs also challenge the Act on the basis that there is not a rational connection between the legislative objective and the

means selected to achieve it. Plaintiffs do not dispute the legitimacy of the stated objective of the Act: "to ensure that high-quality health care continues to be available in this State and that the residents of this State continue to have access to a full spectrum of health care providers, including highly trained physicians in all specialties." *L.* 2004, *c.* 17, § 2(a). We are satisfied that, at bottom, this aspect of their argument asks us to review independently the testimony presented to the Legislature at the time it was considering passage of the Act and to conclude that the Legislature made an incorrect choice when it relied upon the testimony which supported the Act and its assessments and rejected the testimony which opposed it.

This, however, we cannot do. Plaintiffs urge us to adopt the views expressed in a recent opinion of the Wisconsin Supreme Court in which it struck down a statute imposing limits on awards in medical malpractice lawsuits. In the course of its opinion, that court stated, "neither our respect for the legislature nor the presumption of constitutionality allows for absolute judicial acquiescence to the legislature's statutory enactments." *Ferdon v. Wis. Patients Comp. Fund,* 284 *Wis.*2d 573, 701 *N.W.*2d 440, 458 (2005).

We are fully cognizant of our judicial responsibilities and our obligation not to ignore them in favor of the legislative branch of government. We are, however, equally cognizant of the proper limitations of judicial review of legislative actions. In our judgment, if we were to adopt the approach urged here by plaintiffs, we would ignore those limitations and substitute our judgment for that of the Legislature. That we cannot do.

Our Supreme Court recently recognized this principle. Writing for the Court, Justice Albin said:

> Judging whether a statute is effective is a matter for policymakers. *Hutton Park Gardens v. Town Council of West Orange,* 68 *N.J.* 543, 565, 350 *A.*2d 1 (1975); *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 45, 590 *A.*2d 191 (1991). We do not pass judgment on the wisdom of a law or render an opinion on whether it represents sound social policy. *State Farm, supra,* 124 *N.J.* at 45, 590 *A.*2d 191. That is the prerogative of our elected representatives. We must confine our review to the constitutionality of the statute.

In 1976, in *Rybeck v. Rybeck, supra,* the trial court turned aside a constitutional challenge to the No Fault Act that was grounded in the argument that the act failed to achieve the success that had been promised by its proponents. 141 *N.J.Super.* at 493, 358 *A.*2d 828. Judge Richard Cohen addressing the limits of judicial power when passing on the constitutionality of legislation, stated:

'The Constitution does not forbid enactments of ill-fated legislation. It does not authorize retrospective judicial review of the sincerity of the proponents' presentation or the accuracy of the legislative fact-finding. An act is not invalid because it does not work very well. At the time of enactment the No Fault Act was reasonably seen as a sensible remedy for a set of real problems. That is sufficient to satisfy the constitutional requirement of due process of law. It does not matter that there may have been other methods of reform the Legislature might have chosen.'

[*Caviglia, supra,* 178 *N.J.* at 476–77, 842 *A.*2d 125.]

 Plaintiffs also point to what they characterize as "new evidence" casting doubt on the underlying assumptions of the Act. We have considered whether to decline to even review this material, newly submitted on appeal. *Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 300 *A.*2d 142 (1973). In light of the public importance of the issue, however, we have decided against such an approach. We are satisfied, nonetheless, that the material to which plaintiffs point provides no basis to strike down the Act.

The items to which plaintiffs point are a report issued by the Rutgers Center for State and Health Policy and Order No. A05–122 issued by the Department of Banking and Insurance on June 29, 2005, available at http://www.njdobi.org/orders/a05_122.pdf. The Department issued this order pursuant to the Act's directive, noted above, that $17 million dollars of the monies collected be allocated "annually for the purpose of providing relief towards the payment of medical malpractice liability insurance premiums...." *L.* 2004, *c.* 17, § 27(e)(1). The order itself notes that based upon the amounts collected by the Fund, it could develop that less than $17 million would be available for use as subsidies for medical malpractice liability insurance premiums. The order designates the three specialties the Department had determined were eligible for premium subsidy: physicians practicing obstetrics/gynecology; physicians practicing neurosurgery; and physicians practicing di-

agnostic radiology who read mammograms. Order No. A05–122, *supra,* at 17–18.

We reject plaintiffs' argument that the restriction to three specialties demonstrates that there is not a medical crisis in New Jersey. Rather, the order reflects a careful determination to restrict the distribution of funds to those areas in which access to care was perceived to be most seriously threatened. The order noted that to confer eligibility on practitioners whose specialty was not "seriously threatened would minimize or significantly dilute the effect of the subsidy, which would be inconsistent with the intent of the Legislature in enacting the Act." Order No. A–05–122, *supra,* at 14.

Plaintiffs also point to the study, Availability of Physician Services in New Jersey: 2001–2004, Rutgers Center for State Health Policy (2005), http://www.cshp.rutgers.edu/pdf/avail-drsservnj_revisedjuly2005.pdf. Plaintiffs assert that the statistics contained within this study undercut the conclusion that New Jersey had experienced a decline in the number of physicians available to provide medical care and treatment to our residents. In a subject as complex as this, in which the State is attempting to assure the availability of qualified medical practitioners across a wide spectrum of areas of practice, no one study is conclusive. Here, the Legislature looked to a variety of sources and reached its judgment. We decline to second-guess that judgment.

## II.

Plaintiffs also challenge the Act on the ground that certain of its provisions conflict with our Court Rules and thus violate the principle of separation of powers. The principle of the separation of powers is embedded in our Constitution, which states, "[t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." *N.J.*

*Const.* art. 3, ¶ 1. This doctrine is premised on the notion that each branch of government is distinct and "will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch." *Knight v. City of Margate,* 86 *N.J.* 374, 388, 431 *A.2d* 833 (1981) (statute barring members of the judiciary from dealings with casinos did not intrude upon Supreme Court's constitutional authority to regulate the judiciary and the practice of law). Government, however, is not divided into watertight, exclusive spheres of competence. *Ibid.* Inevitably, at times, branches of government will overlap, and the actions of one branch will resemble powers exercised by another branch. *Ibid.*

Our Supreme Court recognized and applied the doctrine of separation of powers in *Winberry v. Salisbury,* 5 *N.J.* 240, 74 *A.2d* 406, *cert. denied,* 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950). Our New Jersey Constitution vests within the Supreme Court the power to "make rules governing the administration of all courts in the state and, subject to the law, the practice and procedure in all such courts." *N.J. Const.* art. VI, § 2, ¶ 3. In *Winberry,* the Court held that "the rule-making power of the Supreme Court is not subject to overriding legislation...." *Winberry, supra,* 5 *N.J.* at 255, 74 *A.2d* 406.

Distinguishing, however, between the realm of practice and procedure, which is vested exclusively within the Supreme Court, and the realm of substantive law, the exclusive domain of the Legislature, may be difficult at times. *Suchit v. Baxt,* 176 *N.J.Super.* 407, 424, 423 *A.2d* 670 (L.Div.1980) (*R.* 4:21–5(e), dealing with medical malpractice panels was not an improper exercise of legislative power by the Supreme Court). In general terms, "[s]ubstantive law defines the parties' rights and duties, whereas procedural law regulates the means through which those rights and duties are enforced." *Ferreira v. Rancocas Orthopedic Assocs.,* 178 *N.J.* 144, 162, 836 *A.2d* 779 (2003) (Zazzali, concurring).

If the rule can determine in and of itself the outcome of the proceeding, it is generally substantive. If it is but one step in the ladder to final determination and

can effectively aid a court function, it is procedural in nature and within the Supreme Court's power of rule promulgation.

[*Suchit, supra,* 176 *N.J.Super.* at 427, 423 *A.2d* 670.]

A statute may, of course, have both procedural and substantive implications. *Ferreira, supra,* 178 *N.J.* at 162, 836 *A.2d* 779. That, however, does not mean that it is automatically unconstitutional. *Id.* at 163, 836 *A.2d* 779. Rather, whether the judiciary will tolerate an intrusion upon its powers turns on a two-prong test that focuses on whether the statute: (1) "serves a legitimate legislative goal," *id.* at 163, 836 *A.2d* 779, and (2) " 'concomitantly, does not interfere with judicial prerogatives or only indirectly or incidentally touches upon the judicial domain.' " *Ibid.* (quoting *Knight, supra,* 86 *N.J.* at 391, 431 *A.2d* 833). The Court will accommodate legislation that touches upon an integral area of judicial power only if the statute has " 'not in any way interfered with this Court's constitutional obligation' to 'insure a proper administration of the court system.' " *Ferreira, supra,* 178 *N.J.* at 163, 836 *A.2d* 779 (quoting *Passaic County Prob. Officers' Ass'n v. County of Passaic,* 73 *N.J.* 247, 255, 374 *A.2d* 449 (1977)).

Plaintiffs assert that § 6 of the Act, which creates the device of an affidavit of noninvolvement, is invalid because it conflicts with *R.* 4:46, which governs motions for summary judgment. We disagree.

Rather than conflicting with summary judgment motion practice, we view the technique of an affidavit of noninvolvement as a supplement to such practice. Further, as the trial court noted, it is not outcome-determinative. Another party to the action has the right to file a motion and demonstrate that the previously-dismissed party should be rejoined in the litigation. The trial court correctly concluded that § 6 does not represent a violation of the separation of powers and is not unconstitutional.

Plaintiffs make the same assertion with regard to § 5 of the Act, directing a judge to refer a medical malpractice action to complementary dispute resolution if the judge has determined

doing so could encourage early disposition or settlement. We see no fatal constitutional conflict.

Section 5, although it deals with procedure, is not outcome determinative. Further, there is no conflict with *R.* 1:40–1 to –12. Once the judge determines that referral is appropriate, further proceedings will be in accordance with the rule.

The final section which plaintiffs challenge on the basis of separation of powers is § 7, which deals in great specificity with the issue of expert witnesses and expert testimony. Plaintiffs assert this section is unconstitutional because it conflicts with the Rules of Evidence, specifically, *N.J.R.E.* 702.

Whether the Rules of Evidence should be deemed procedural or substantive is a question that has provoked discussion and debate. The rules of evidence are typically both substantive and procedural. *Rybeck v. Rybeck*, 141 *N.J.Super.* 481, 509, 358 *A.*2d 828 (Law Div.1976), *appeal dismissed*, 150 *N.J.Super.* 151, 375 *A.*2d 269 (App.Div.), *certif. denied*, 75 *N.J.* 30, 379 *A.*2d 261 (1977). The New Jersey Rules of Evidence, enacted under the Evidence Act of 1960, *N.J.S.A.* 2A:84A–1 to –49, resulted from the cooperative effort of the three branches of government. *Id.* at 510, 358 *A.*2d 828. The history of the adoption of the evidence rules is discussed at length in *State v. D.R.*, 109 *N.J.* 348, 373–75, 537 *A.*2d 667 (1988). The Evidence Act thus provides that "[a]ny rule or rules so proposed or adopted shall be subject to change or cancellation at any time by statute or by a subsequent rule adopted pursuant to this article." *N.J.S.A.* 2A:84A–37.

We are satisfied the trial court correctly concluded that § 7 is not invalid. We note in particular the escape valve under which a litigant may obtain judicial relief and utilize an expert who does not fit precisely within the parameters set down by the statute.

### III.

The next argument put forth by plaintiffs is that the Act constitutes unconstitutional special legislation. Pursuant to

art. IV, § 7, ¶ 9 of the New Jersey Constitution, "[t]he Legislature shall not pass any private, special or local laws: ... (6) [r]elating to taxation or exemption therefrom." *N.J. Const.* art. IV, § 7, ¶ 9. Determination of whether a statute constitutes special legislation focuses upon what the enactment excludes and the appropriateness of that exclusion viewed in light of the statute's legislative purpose. *Camden City Bd. of Educ. v. McGreevey,* 369 *N.J.Super.* 592, 604, 850 *A.2d* 505 (App.Div.2004) (Municipal Rehabilitation and Economic Recovery Act was not special legislation even though only City of Camden fit within definition of qualified municipality). Legislation is considered special, " 'when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate.' " *Town of Secaucus v. Hudson County Bd. of Taxation,* 133 *N.J.* 482, 494, 628 *A.2d* 288 (1993) (quoting *Town of Morristown v. Woman's Club,* 124 *N.J.* 605, 622, 592 *A.2d* 216 (1991)) (statute which had the effect of making Bayonne the only Hudson County municipality exempt from the obligation to contribute to the support of county vocational school was invalid special legislation), *cert. denied,* 510 *U.S.* 1110, 114 *S.Ct.* 1050, 127 *L.Ed.2d* 372 (1994). Conversely, a statute is deemed "general" legislation if: (1) " 'the class of subjects established by characteristics sufficiently marked and important to make it a class by itself,' " and (2) " 'it encompasses all of the subjects which reasonably belong within the classification, and does not exclude any which naturally belong therein.' " *Camden, supra,* 369 *N.J.Super.* at 604, 850 *A.2d* 505 (quoting *Paul Kimball Hosp., Inc. v. Brick Twp. Hosp., Inc.,* 86 *N.J.* 429, 445, 432 *A.2d* 36 (1981)).

In *Vreeland v. Byrne,* 72 *N.J.* 292, 370 *A.2d* 825 (1977), the New Jersey Supreme Court set forth a three-part test to distinguish between general and special legislation:

[W]e first discern the purpose and object of the enactment. We then undertake to apply it to the factual situation presented. Finally, we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.

[*Vreeland,* 72 *N.J.* at 300–01, 370 *A.*2d 825 (finding provision in statute that authorized raise for the Legislature but directed it would not apply to a member subsequently appointed to the Court to constitute special legislation).]

The party challenging the legislation bears the burden of demonstrating that the statute is unconstitutional. *Secaucus, supra,* 133 *N.J.* at 493, 628 *A.*2d 288.

 The test for distinguishing between general and special legislation is similar to the analysis employed when reviewing an individual's equal protection claim. Camden, *supra,* 369 *N.J.Super.* at 605, 850 *A.*2d 505. Therefore, " 'the Legislature has wide discretion in determining the perimeters of a classification' " and " '[a]n adequate factual basis for the legislative judgment is presumed to exist.' " *Ibid.* (quoting *Paul Kimball, supra,* 86 *N.J.* at 446–47, 432 *A.*2d 36). Legislation is entitled to a presumption of validity which is only rebutted by showing that the statute is clearly repugnant to the Constitution. *N.J. State Firemen's Mut. Benevolent Ass'n v. N. Hudson Reg'l Fire & Rescue,* 340 *N.J.Super.* 577, 588, 775 *A.*2d 43 (App.Div.), *certif. denied,* 170 *N.J.* 88, 784 *A.*2d 721 (2001). Moreover, the courts may not act as a super-legislature. *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222, 486 *A.*2d 305 (1985) (citing *Burton v. Sills,* 53 *N.J.* 86, 95, 248 *A.*2d 521 (1968), *appeal dismissed,* 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969)). Thus, a statute will only be invalidated if "it clearly and irremediably violates the constitutional provisions prohibiting special legislation." *Secaucus, supra,* 133 *N.J.* at 493, 628 *A.*2d 288.

 Utilizing the test articulated in *Vreeland,* we are satisfied the Act does not constitute special legislation. We are not persuaded that the fact that the Act does not include individuals such as nurses, hospital administrators, technicians and others associated with providing health care and treatment is a sufficient basis to consider the bill special legislation. As the Court noted in *Secaucus, supra,* a statute will be struck down as special legislation only if "it clearly and irremediably" runs afoul of the constitutional bar to special legislation. *Secaucus, supra,* 133 *N.J.* at 493, 628 *A.*2d 288. Plaintiffs' showing in this regard is insufficient.

## IV.

■ Plaintiffs' final argument is that the Act is unconstitutional because it represents the use of public funds to subsidize private health care professionals.

■ Under the New Jersey Constitution,

[n]o county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stocks or bonds of any association or corporation.

[*N.J. Const.* art. VIII, § 3, ¶ 2.]

Furthermore, "[n]o donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatsoever." *N.J. Const.* art. VIII, § 3, ¶ 3. Together, these two provisions embody the fundamental doctrine that public money should be "raised and used only for public purposes." *Roe v. Kervick,* 42 *N.J.* 191, 207, 199 *A.*2d 834 (1964) (upholding the validity of the Area Redevelopment Assistance Act).

■ In *Roe,* the New Jersey Supreme Court set forth a two-part test for determining whether the challenged expenditure violated the State Constitution: "First, whether the provision of financial aid is for a public purpose, and second, whether the means to accomplish it are consonant with that purpose." *Bryant v. City of Atlantic City,* 309 *N.J.Super.* 596, 612, 707 *A.*2d 1072 (App.Div.1998) (citing *Roe, supra,* 42 *N.J.* at 212, 199 *A.*2d 834 and finding that redevelopment plan did not involve donation of public land to redeveloper). Under prong one, a public purpose is defined as that which "serves as a benefit to the community as a whole, and which, at the same time is directly related to the function of government." *Roe, supra,* 42 *N.J.* at 207, 199 *A.*2d 834. Prong two requires the court to consider whether:

[1] the transaction, involving the transfer of public money, [is] contractual in nature, and if so, is it based upon a substantial consideration from the recipient of the money apart from simply an obligation to repay the money with interest, which consideration is intimately associated and burdened with execution of the public purpose of the statute? [2] Is the agreement of the recipient of the financial

assistance to accomplish the public purpose of the statute ... the paramount factor in the contract, and is any private advantage incidental and subordinate?
[*Id.* at 218, 199 *A.*2d 834.]

Applying the two-part test set forth in *Roe*, it is apparent that the Act does not violate this constitutional prohibition. The allocation of financial aid to physicians serves a public purpose by attempting to assure the availability of medical care and treatment. There is, moreover, sufficient consideration for the subsidies received because the Act requires that those who receive such subsidies continue their practice in this state. That an individual physician may receive a benefit does not detract from greater good.

## V.

We recognize and sympathize with plaintiffs' evident distress at the passage of the Act. It is clear that they view the legislation as an attempt to blame lawyers for the fact that there are problems in our health care system and as one more symptom of the apparent disdain with which certain segments of today's society view lawyers and the efforts they expend on behalf of their clients. It would therefore be remiss on our part if we were not to acknowledge the critical role that lawyers play and the contributions they make to our system of justice. Before becoming judges, we were practicing lawyers and remain proud to be members of the bar in New Jersey. Our sympathies, however, cannot cloud our judicial responsibilities. The Legislature has acted after considering a mass of conflicting evidence. That other conclusions could have been reached based upon that record, or that we might prefer that a different result had been reached, does not justify us in setting aside the legislative judgment.

The order granting summary judgment to defendants is affirmed.