838 A.2d 529

STATE OF NEW JERSEY IN THE INTEREST
OF G.B., A JUVENILE.

Superior Court of New Jersey
Appellate Division

Submitted November 5, 2003—Decided January 7, 2004.

Before Judges PRESSLER, CIANCIA and PARKER.

*Yvonne Smith Segars,* Public Defender, attorney for appellant G.B (*Sylvia Orenstein,* Assistant Deputy Public Defender, of counsel and on the brief).

*John Kaye,* Monmouth County Prosecutor, attorney for respondent State of New Jersey (*Michael J. Costanzo,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

PARKER, J.A.D.

G.B., a juvenile, appeals from his adjudication of delinquency on a charge that would constitute second degree sexual contact, *N.J.S.A.* 2C:14–2b, if he were an adult. G.B. was sentenced to a term of three years probation on the condition he undergo psychiatric and psychological evaluations and attend a program for sex

offenders who deny the accusations. He was also required to register under Megan's Law. We reverse.

The incident leading to the charge against this juvenile occurred on August 31, 2000, when four-year-old M.C. had been playing at G.B.'s home with G.B. and his five-year-old brother. G.B. was twelve years old at the time. The children's families were neighbors and friends. When M.C. came home that evening, her mother noticed the child scratching her vaginal area. When the mother asked why she was touching herself, the child told her that G.B. had been touching her. When her mother persisted in the questioning, the child pulled her underpants aside and rubbed her vagina to show her mother how G.B. had touched her. The mother testified that the child said, "They had showed her their pee pees," and someone told her to "suck my big cock." The mother testified further that she started crying and was visibly upset when M.C. told her these things, leading M.C. to become upset because mommy was crying. When the mother attempted to question the child further, the child changed the subject.[1]

The next morning, the mother took M.C. to her pediatrician, who found a normal hymen and no signs of bruising or redness. Nevertheless, the doctor told the mother to take the child to the emergency room for cultures. The mother did so and then called the police. When Detective Scully came to the home, he only spoke to the parents and did not question the child. On September 3, while taking her bath, the child told her mother that G.B. "put his pee pee in my mouth," and that G.B.'s "daddy came and slapped him in the face."

On September 12, 2000, the police attempted to interview the child, but she would not cooperate. On October 25, almost two

---

1 We note that a significant body of research supports the proposition that the emotional tone of the initial questioning of the child can significantly alter the reliability of the child's report and that children in the three to four-year-old age group are most vulnerable to suggestions by the questioner. S. Ceci and M. Bruck, *Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony,* pp. 87–159, 233–38 (Am. Psychological Assoc.1995).

months after the incident,[2] the child's father took her to the prosecutor's office, and this time, a videotaped interview was conducted.

Detective Natalie Jones–Zuppa, who conducted the videotaped interview, testified that she found the child credible. On the videotape, M.C. used the word "treasure" when referring to the genitals of both males and females and said that G.B. put his pee pee near her mouth. When asked by the detective, "Who put the pee pee in your mouth?" the child answered that G.B. did.

At trial, the child's testimony was fairly inarticulate. For example:

[Prosecutor] What did [G.B.] do to you?

A. Him suck my treasure.

Q. He sucked your treasure? Okay. Did he do anything else?

A. No.

In another instance, the prosecutor showed the child a picture of a boy and asked M.C. to identify body parts. When she reached the genital area, the prosecutor said:

Q. Okay. And you can use any word you want for that. What would you call that part of the boy?

A. I don't know.

Q. You don't know, okay, you could call it a private part—

[Objection and colloquy]

Q. Has that part of a boy's body ever touched you?

A. No.

Q. No? Okay. And you said [G.B.] sucked your treasure?

A. Yeah.

Q. Did [G.B.] do anything else?

A. Yes.

Q. What did he do?

A. He didn't let me go in his room.

---

[2] Research further indicates that the length of time between an incident and the interview may affect the reliability of a pre-schooler's statements. *Jeopardy, supra,* at 89.

Q. Okay. And did [G.B.] ever touch any other part of your body?

A. No.

The juvenile's counsel declined to cross-examine the child, but the court asked her a number of questions. Starting with the picture of the girl, the judge pointed to the genital area and asked:

THE COURT: This part on the girl, okay, you call that a what?

THE WITNESS: A treasure.

THE COURT: A treasure? That same part on a boy, okay, do you have any kind of name for that?

THE WITNESS: No.

THE COURT: No? What is a pee pee?

THE WITNESS: I don't know.

THE COURT: You don't know what a pee pee is?

THE WITNESS: No.

THE COURT: Did you ever tell anybody that. Did you ever use the word pee pee?

THE WITNESS: No.

* * * *

THE COURT: Have you ever heard of the word cock?

THE WITNESS: No.

THE COURT: You never heard that word before?

THE WITNESS: Uhn-uhm.

THE COURT: Did you ever hear [G.B.] use the word cock?

THE WITNESS: No. Well—

THE COURT: I'm sorry?

THE WITNESS: No.

THE COURT: No. Did you ever tell your mommy or daddy that [G.B.] used the word cock?

THE WITNES: Yes.

THE COURT: Why did you tell them that?

THE WITNESS: Because we have to tell the truth.

THE COURT: Okay. So what did you tell your mommy and daddy about [G.B.] using the word cock? What did you tell them?

THE WITNESS: I don't know.

THE COURT: You don't know? And do you ever remember [G.B.] saying to you to suck my big cock?

THE WITNESS: Yes.

THE COURT: You do remember that. Why didn't you tell us that earlier?

THE WITNESS: I don't know.
THE COURT: You don't know. Okay.

G.B.'s father testified that the two families have lived next door to each other for five years and he has known M.C. since she was born. He indicated that M.C. played at his house almost daily that summer and that the children wrestled a lot when they played. He was often present when M.C. was at his house but not on the day of the alleged incident.

In rendering his decision, the trial judge found no evidence that the child's statements were unduly influenced by her parents or the detective and that the child was competent to testify.[3] The judge relied heavily on the videotaped interview of the child in finding that "the State [had] proven beyond a reasonable doubt that sexual contact did occur on or about August 31, 2000" and that sexual penetration did not occur.

In this appeal, the juvenile argues:

*POINT ONE*

THE TRIAL COURT ERRED IN ADMITTING M.C.'S OUT-OF-COURT STATEMENTS BECAUSE THEY DID NOT CONTAIN SUFFICIENT INDICIA OF PROBABLE RELIABILITY.

*POINT TWO*

BECAUSE THERE WAS NO EVIDENCE THAT THE JUVENILE INTENDED EITHER HIS OWN SEXUAL GRATIFICATION OR THE VICTIM'S DEGRADATION OR HUMILIATION WHEN HE TOUCHED HER, THE JUVENILE'S ADJUDICATION OF DELINQUENCY FOR CRIMINAL SEXUAL CONTACT MUST BE REVERSED. (*U.S.CONST.* AMEND. XIV; *N.J. CONST.* ART. I, ¶ 1) (Not Raised Below)

*POINT THREE*

BECAUSE JUVENILES ARE NOT AFFORDED THE FULL PANOPLY OF CONSTITUTIONAL GUARANTEES ENJOYED BY ADULTS ACCUSED OF CRIMINAL OFFENSES, APPLICATION OF THE STRINGENT MANDATORY REGISTRATION AND NOTIFICATION REQUIREMENTS OF MEGAN'S LAW TO THIS JUVENILE VIOLATED HIS RIGHTS TO EQUAL PROTECTION AND DUE PROCESS OF THE LAW. (*U.S. CONST.* AMEND. XIV; *N.J. CONST.* (1947), ART. I, ¶ 1)

*POINT FOUR*

---

[3] Repeated questioning of a young child may significantly affect the child's reliability. *Jeopardy, supra,* at p. 107–125.

THE APPLICATION OF MEGAN'S LAW TO THIS JUVENILE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

■ *N.J.S.A.* 2C:14–2(b) provides that "[a]n actor is guilty of sexual assault if he commits an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years older than the victim." Sexual contact is defined as:

> [A]n intentional touching by the victim or actor either directly or through clothing, of the victim's or actor's intimate parts *for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor.*
> [*N.J.S.A.* 2C:14–1d (emphasis added).]

■ The elements of sexual contact then are: (1) a victim less than thirteen years old; (2) an actor four years older than the victim; (3) an intentional touching of intimate parts; *and* (4) a purpose of degrading or humiliating the victim *or* sexually arousing or gratifying the actor. *State v. Zeidell,* 154 *N.J.* 417, 428, 713 *A.*2d 401 (1998). The fourth element is essential. "[U]nlike crimes such as homicide, where the perpetrator's intent may be inferred from the manner in which the offense was committed, the nature of the crimes of sexual assault and endangering the welfare of a child do not give rise to any such inference." *State v. Cusick,* 219 *N.J.Super.* 452, 466, 530 *A.*2d 806 (App.Div.), *certif. denied,* 109 *N.J.* 54, 532 *A.*2d 1118 (1987). The State must prove beyond a reasonable doubt that the "intentional touching must be for at least one of four purposes: either degrading or humiliating the victim, or sexually arousing or sexually gratifying the defendant-actor." *Zeidell, supra,* 154 *N.J.* at 428, 713 *A.*2d 401. No such evidence was presented by the State.

■ Our scope of review is limited to a determination of whether there was sufficient credible evidence in the record to support the findings and conclusions of the trial judge, *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964), giving "due regard" to his or her credibility assessments. *State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999). We have combed the record, and we find no evidence to prove beyond a reasonable doubt the fourth element of sexual arousal/gratification or the victim's degradation/humiliation. Moreover, the trial judge made no finding that G.B.

acted with a purpose to degrade or humiliate M.C. or to sexually arouse or gratify himself. To the contrary, on the day of disposition, the trial judge stated:

I think this was an unfortunate incident. I don't think he had malice necessarily in his body when he did this. One might even have said it was some type of a curiosity thing. But certainly, it was inappropriate conduct that even an 11 or 12-year old would know was inappropriate.

Inappropriate conduct, by itself, is not criminal. In failing to prove the fourth element, the State failed to prove beyond a reasonable doubt that G.B. committed the offense of criminal sexual contact. We, therefore, reverse the adjudication of delinquency. We need not address the remaining issues raised by the juvenile in this appeal.

Reversed.