23 A.3d 937 (2011)
421 N.J. Super. 329
STATE of New Jersey in the Interest of B.P.C.
State of New Jersey in the Interest of B.V.C.
DOCKET NO. A-4322-08T4, A-5855-08T4
Superior Court of New Jersey, Appellate Division.
Argued February 16, 2011.
Decided July 18, 2011.
*940 David W. Fassett argued the cause for appellant in A-4322-08 (Arseneault Whipple Fassett & Azzarello; attorneys; Mr. Fassett, on the brief.).
Robert G. Wilson argued the cause for appellant in A-5855-08 (Kovacs & Wilson, attorneys; Mr. Wilson, on the brief).
Daryl A. Williams, Assistant Prosecutor, argued the cause for respondent (Geoffrey D. Soriano, Somerset County Prosecutor, attorney; Mr. Williams, on the brief).
Before Judges FUENTES, ASHRAFI and NUGENT.
The opinion of the court was delivered by
FUENTES, J.A.D.
These are back-to-back appeals, consolidated for the purpose of this opinion.
B.V.C. (hereinafter referred to by the fictitious name "James") was adjudicated delinquent by the Family Part based on five charges that, if committed by an adult, would have constituted fourth degree criminal sexual contact, N.J.S.A. 2C:14-3, two disorderly persons offenses of simple assault, N.J.S.A. 2C:12-1a(1), and two petty disorderly persons offenses of harassment, N.J.S.A. 2C:33-4b. B.P.C. (hereinafter referred to by the fictitious name "Daniel") pled guilty to committing these same acts of delinquency.
By way of disposition, the court placed James on probation for a period of eighteen months; ordered him to perform forty hours of community service; directed him not to have any contact with the victims, nor unsupervised contact with children under the age of twelve; and placed him on electronically monitored home-detention for thirty days. With respect to Daniel, the Family Part placed him on probation for one year and ordered him not to have any contact with the victims.
Because James and Daniel were fourteen years old at the time they committed the act of delinquency predicated on fourth degree offense of criminal sexual contact, the Family Part directed them to register as sex offenders for the remainder of their lives pursuant to N.J.S.A. 2C:7-2b(2) (commonly known as "Megan's Law").[1]
Although the parties raised a number of arguments on appeal, the principal question we have been asked to determine is whether the conduct of these two juveniles constitutes "sexual contact" as defined in N.J.S.A. 2C:14-1d, or merely youthful "horseplay" that, although patently offensive, is nevertheless devoid of the sexual connotation underpinning the offense of criminal sexual contact, N.J.S.A. 2C:14-3. Because an adjudication of delinquency *941 based on criminal sexual contact triggers the registration requirements under N.J.S.A. 2C:7-2b(2), we are keenly aware that our decision may have profound, lifelong ramifications for these two boys as well as others similarly situated.
In addressing this question, we are mindful that the evidence supporting these adjudications of delinquency differs because James was adjudicated delinquent after a trial, while Daniel's adjudication was based on the factual basis he gave at the plea hearing. The core salient facts presented by the State nevertheless established that James and Daniel physically held down two twelve-year-old boys and placed their bare buttocks on the faces of the two younger boys, resulting in physical contact between their bare buttocks and the victims' faces. The trial court found James and Daniel committed these acts for the purpose of degrading or humiliating the younger boys. This finding supports an adjudication of delinquency based on criminal sexual contact.
In relevant part, our state's criminal code defines "sexual contact" as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-1d. In determining whether the State met its burden of proof with respect to proving an "intentional touching," we are satisfied the conduct engaged in by these two juveniles is sufficient to sustain an adjudication of delinquency predicated on criminal sexual contact.
The Family Part erred, however, when it denied James's post-conviction relief (PCR) petition. The affidavit submitted by James's trial attorney in support of this PCR petition made out a prima facie case of ineffective assistance of trial counsel. We are thus compelled to remand this matter for the court to conduct an evidentiary hearing to resolve the factual and legal issues raised by trial counsel's inadequate performance.
We also remand Daniel's adjudication of delinquency because he was not fully informed of the registration requirements under N.J.S.A. 2C:7-2b(2) before he pled guilty to an act of delinquency predicated on fourth degree criminal sexual contact.

I

Common Core of Facts
On the afternoon of November 26, 2008, a group of sixth-grade boys rode their bicycles to a nearby food market where they bought sodas and snacks. As they left the store, one of the boys (identified here as W.R.) picked up a scooter that was "placed in front of the [market.]" At this point, a group of older eighth-grade boys consisting of James, Daniel, and two others approached the sixth-graders.
According to W.R., James asked him: "Why are you stealing my scooter?" When W.R. denied he was trying to steal the scooter, James told him: "Drop and give me ten," which W.R. understood to mean he had to do ten push-ups. When W.R. did not comply, the older boys pushed him up against a small shed. At this point, an unidentified woman came out of the store and asked what was happening. James told the woman that W.R. had stolen his scooter and his dog; Daniel told her that W.R. had "killed his family." The woman then went back inside the store.
The physical confrontation escalated from this point. W.R. testified that the four older boys "picked [him] up and carried [him] across the street ... [to a] flag pole by the fire station." The boys again told W.R. to "drop and give me ten." W.R. asked: "Will you stop?" to which one *942 of the older boys allegedly responded: "Yes." Convinced the taunting would stop, W.R. complied and performed ten push-ups.
After W.R. completed doing the push-ups, the older boys challenged W.R. and his three sixth-grade companions to a basketball game. Although the precise terms of the match are unclear, James told a state investigator that if the younger boys won, the older boys would jump in the nearby river; if the older boys won, they would "beat up" the younger boys. James told the investigator, however, that he and his fellow eighth-graders were "just kidding" about beating up the sixth-graders, and that they "thought [the younger boys] knew we were [kidding]." W.R. believed that if the younger boys won, the older boys would stop bothering them. The older boys won.
After the basketball game ended, W.R. and his fellow sixth-graders noticed the older boys talking in a group. Suspecting that "something was up," W.R. and the rest of the sixth-graders ran away; the older boys gave chase. James eventually caught up with a sixth-grader identified here as O.D. James told O.D. the older boys would stop bothering the younger boys if O.D. stuck his face in the nearby river "for a few seconds." O.D. testified that he did this because he was scared.
W.R. testified that after O.D. stuck his head in the river, an eighth-grader identified as S.H. got on top of W.R., physically holding him down, punching him, head-butting him, slapping him, and making him say things like "I like chodes[2] up the butt." W.R. gave the following description of what occurred next:
PROSECUTOR: At some point, did [James] approach your area?
A. Yes.
Q. And when he approached your area, what did he do?
A. They told him to put his butt in my face.
Q. Okay. They told him. Who told him?
A. [Daniel]. [Daniel] told them.
Q. [Daniel] told [James] to put his butt in your face?
A. Yes.
Q. And did [James] do that?
A. Yes. Well, he putat first he farted in my face.
Q. Okay. So first he farted in your face. And then did he put his butt in your face?
A. Yes.
Q. Did he put his bare butt in your face?
A. Yes.
Q. And how did he put his bare butt in your face?
A. He[S.R.] was holding me down, so I couldn't move. So he kind of pulled part of his pants down and sat on me, sat on my face.

Q. Okay. With his bare butt?

A. Yes.

Q. Okay. At any point did any other part of his crotch area touch your face?

A. Yes.

Q. What part?

A. He put his penis in, like there, in my mouth.

Q. Okay.
THE COURT: Indicating
Q. Can you show the judge?

*943 THE COURT: Yeah. Okay, Did it go into the mouth? Or touch the lips?

[W.R.] Itjust the lips.

THE COURT: Touched the lips? Or well, you're putting your finger inside your mouth.
[W.R.] Well
THE COURT: And I want to know if
[W.R.] Like, the lips, the lips.
THE COURT: Did it go in
[W.R.] No.
THE COURT: Just on the outside of the lips, or the inside of the lips?
[W.R.] Kind of the inside the lips [sic].
Q. Before this happened, before his penis touched your mouth, did you hear anybody say anything?
A. Like telling him to do?
Q. Well, did you hear anybody tell [James] to do that?
A. Yes.
Q. Who?
A. [Daniel].
Q. Okay. And when [Daniel] told [James] that, did he do it?
A. Yes.
[(Emphasis added).]
In addition to seeing what happened to W.R., sixth-grader A.N. also witnessed James commit similar offenses against O.D. In response to the prosecutor's questions, A.N. gave the following account of what he saw:
PROSECUTOR: Was [O.D.] struggling when [James] put his bare butt in his face?
A. Yes.
Q. And actually sat on his face with his bare butt?
A. He didn't put all of his force on his face. He was just on top of it.
Q. On top, but touching it with his butt?

A. I don'tit wasn't touching. He was like hovering over. He was moving, and it might have touched him when he was moving.

Q. And with [James], did he put his bare butt in [W.R.'s] face?
A. Yes.
[(Emphasis added).]
According to A.N., while James and Daniel were committing these acts, the other eighth-graders laughed and carried on without any apparent concern or alarm. O.D. testified that after it was over and he and the rest of the sixth-grade boys were heading for their bicycles, James walked up to the boys and offered them ten dollars in return for "not [] tell[ing] on us and stuff."
At the time these events occurred, O.D.'s older sister E.D. and James were classmates. She testified that later that same day James called her and asked her if O.D. "was a tattletale." When E.D. inquired further, James told her that he "had rubbed his bare butt in [her] brother's face after he had put his face in the water down by the river." James asked E.D. not to tell her mother about this incident. James later text messaged E.D. asking her whether O.D. had told his mother and whether the mother intended to report the incident to the police. E.D. responded: "Maybe."

II

The Police Investigation
Detective Owen M. Duff began his investigation on the night of the incident when he interrogated James, who had voluntarily reported to the police station accompanied by his parents. After waiving his constitutional rights under Miranda,[3] *944 James agreed to answer questions about the incident. After describing the events that led to "put[ting]" W.R.'s and O.D.'s faces in the river, James told Detective Duff: "[w]e put our butt in [W.R.'s] face and [O.D.'s]." When asked to elaborate, James at first claimed that he wore his boxer shorts during the incident. He eventually admitted that he exposed his bare buttock and put it "in their (W.R. and O.D.) face[s]."
Later on in the interrogation James told the detective he did this only to O.D. He also stated that he never exposed his penis during the entire incident. At the request of James's father, the interrogation concluded without further elaboration by James as to what he meant by putting his buttocks "in their face[s]." A video recording of the interrogation was played in open court and admitted into evidence as part of the State's case.
At trial, James testified that while another eighth-grader held O.D. down, Daniel put his buttocks in O.D.'s face and "then [Daniel] stopped and then I went up and put my butt in his face." James denied, however, that his bare buttocks came in contact with O.D.'s face.
When asked why he did it, James testified: "Cause I thought it was funny and I was trying to get my friends to laugh. I was trying to impress them.... Everyone was laughing." According to James, the brutality of what had occurred revealed itself to him only "[a]fter I got off [O.D.]when he got up [and] he started, like, gagging ... that's when I knew that, like, it wasn't a joke anymore. I felt bad for him."

III

Trial Court's Findings
Against this record, the Family Part adjudicated James delinquent for acts that, if committed by an adult, would constitute the offense of fourth degree criminal sexual contact, N.J.S.A. 2C:14-3. The judge accepted as credible the testimony of W.R. and O.D. describing what had been done to them. Specifically, the judge found James's penis touched the face or lips of W.R., but did not penetrate his mouth. He found James "rubbed" his bare buttocks on the faces of both boys. The judge rejected as not credible James's account of what occurred. Despite his testimony, the judge found James was not truly remorseful but merely afraid to face the consequences of this "classic bullying situation."
As to James's intent or purpose, the judge found James committed these acts to "humiliate" or "degrade" his victims, but not for "sexual gratification." As the judge explained:
But it was degrading [W.R.] and [O.D.] in order to satisfy [James]. And to get the others to laugh. Laughing. This was [James' fourteenth] birthday. This is how [James] chose to spend and celebrate his birthday. By degrading and humiliating others.
I find that force was used. That [James] in concert with the others, [Daniel] ..., used physical force to hold both [O.D.] and [W.R.] down as this was being done to them.
I find that his intent was for the purpose of degrading and humiliating both of them.
I find that criminal sexual contact, as defined by the statute, has been met because there was an intentional touching of [James's] intimate parts, done on [O.D.] and [W.R.] for the purpose of degrading and humiliating.

IV

Sufficiency of the Evidence Criminal Sexual Contact
Before discussing the legal errors that form the basis for our disposition *945 of these appeals, we will first address the central question raised by both juveniles concerning the sufficiency of the evidence relied on by the trial court to find them guilty on the charge of criminal sexual contact. Because both cases are remanded to the trial court, these juveniles continue to face the prospect of conviction, with all of the serious lifelong penal ramifications discussed herein.[4]
Accepting, arguendo, the facts found by the trial court, both juveniles maintain that common sense dictates we construe the statutory definition of "sexual contact" to avoid criminalizing what they characterize as childish "inappropriate horseplay." According to this line of reasoning, strict construction of "sexual contact" would criminalize teenage pranks such as putting a sign on the buttocks of an unsuspecting classmate that reads: "Slap me here." Both the juvenile who placed the sign and any individual who followed its instructions would be guilty of criminal sexual contact because this scenario involves an intentional touching of the victim's intimate body part with the purpose of degrading or humiliating the victim.
Appellants thus argue what occurred here falls within the realm of the kind of juvenile horseplay that, when viewed in retrospect through the eyes of adults, may seem insensitive, boorish, or even cruel, but at its core is no more than a prank that does not warrant the lifelong penal consequences associated with the offense of criminal sexual contact. Stated differently, James and Daniel concede they made a childish mistake for which they should be punished, but they do not deserve to be labeled "sexual offenders" for the rest of their lives.
Appellants cite State ex rel. D.W., 381 N.J.Super. 516, 887 A.2d 156 (App.Div. 2005), and State ex rel. G.B., 365 N.J.Super. 179, 838 A.2d 529 (App.Div.2004), in support of their position. We reject this line of reasoning because the legal principles expressed in these cases are not applicable to the material facts and circumstances we confront here. The factual underpinnings of these cases are also clearly distinguishable.
In D.W., a fourteen-year-old boy was charged with harassment, which was later amended to criminal sexual contact, because he intentionally touched the buttocks of a female classmate. Id. at 517, 887 A.2d 156. He was adjudicated delinquent as charged and directed to comply with the provisions of Megan's Law. Ibid. We reversed because the "event occurred in a classroom in the presence of others, and [] the touching was brief[.]" Id. at 518, 887 A.2d 156. Most importantly, we found the victim's claim that she was "embarrassed" did not support a finding that the defendant had touched her with the purpose to degrade or humiliate. Ibid. In that context, we recognized that "[c]ommon sense dictates that this conduct represented nothing more than inappropriate horseplay between schoolmates," rather than the serious behavior that would support a charge of criminal sexual contact. Ibid.
In G.B., a twelve-year-old boy was adjudicated delinquent on a charge that would constitute criminal sexual contact. G.B., supra, 365 N.J.Super. at 180-81, 838 A.2d 529. The juvenile was ordered to register as a sex offender under N.J.S.A. 2C:7-2b(2) *946 because the four-year-old victim claimed the boy had put his "pee pee" in her mouth and had sucked on her "treasure," which was the word she used for genitals. Id. at 180-83, 838 A.2d 529. Despite the trial court's findings, the evidence concerning whether the victim actually performed fellatio was far from clear. At trial, the girl could not name or identify any parts of a male's reproductive anatomy. Id. at 183-84, 838 A.2d 529.
Addressing the juvenile's state of mind, the G.B. panel did not find any evidence that addressed whether he engaged in this conduct for the purpose of degrading or humiliating the victim or sexually gratifying or arousing himself, noting that the trial judge stated:
I think this was an unfortunate incident. I don't think he had malice necessarily in his body when he did this. One might even have said it was some type of a curiosity thing. But certainly, it was inappropriate conduct that even an 11 or 12 year old would know was inappropriate.
[Id. at 186, 838 A.2d 529.]
By contrast, the cases before us do not involve an isolated incident of one classmate inappropriately slapping another classmate on the buttocks causing a mere fleeting moment of embarrassment to the victim, as was the case in D.W., or an act of "sexual curiosity" devoid of any malice or purpose to degrade or humiliate the victim, as the court characterized the juvenile's conduct in G.B.
James and Daniel used their bare buttocks, which by implication must have also exposed all of their constituent anatomical parts, as key components of the message they sent to W.R. and O.D. Although James and Daniel may not have done this for their own sexual gratification, the record showed that the victims were humiliated and degraded by this message of sexual prowess and domination. What occurred here were deliberate acts of extreme bullying, carried out by James and Daniel with a clear intent to degrade and humiliate the two younger and physically weaker victims, using unmistakably sexual connotations to accentuate the message.
The offense of fourth degree criminal sexual contact is predicated on the actor committing sexual contact through the use of force or coercion without the victim sustaining serious injury. N.J.S.A. 2C:14-3b; N.J.S.A. 2C:14-2c(1). The Legislature defined "sexual contact" as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-1d. "Intimate parts" includes the buttocks. N.J.S.A. 2C:14-1e. N.J.S.A. 2C:14-3b provides: "An actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2 c.(1) through (4)."
As our Supreme Court recently reaffirmed:
When interpreting statutory language, the goal is to divine and effectuate the Legislature's intent. In furtherance of that goal, we begin each such inquiry with the language of the statute, giving the terms used therein their ordinary and accepted meaning. When the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids.
[State v. Shelley, 205 N.J. 320, 323-324, 15 A.3d 818 (2011) (internal citations omitted).]
Labeling these outrageous acts mere "horseplay" runs counter to the clear language *947 defining the offense of criminal sexual contact.
We recognize the severe penal consequences that flow from an adjudication of delinquency based on fourth degree criminal sexual contact. When, as here, the victims are under the age of thirteen, criminal sexual contact also falls within the crimes designated by the Legislature as requiring a defendant to register as a sex offender under N.J.S.A. 2C:7-2b(2). Because these juveniles were fourteen years old on the day they allegedly committed this offense (James actually turned fourteen years old that day), the registration requirements continue for their entire lifetime. In Re Registrant J.G., supra, 169 N.J. at 338-40, 777 A.2d 891. Criminal sexual contact also is statutorily designated as a predicate sexually violent offense that permits the State to seek a defendant's civil commitment as a sexually violent predator. N.J.S.A. 30:4-27.26 to -27.29.
Although we are not unsympathetic to the arguments criticizing the application of the lifelong registration requirements in N.J.S.A. 2C:7-2b(2) to fourteen-year-old offenders, we are bound to uphold such application because that outcome is mandated by the Legislature. Our role as a court is not to question the wisdom of legislative enactments, but to enforce them as long as they are not contrary to constitutional principles. See New Jersey State Bar Ass'n v. State, 387 N.J.Super. 24, 43, 902 A.2d 944 (App.Div.), certif. denied, 188 N.J. 491, 909 A.2d 726 (2006).

V

The Post-Conviction Relief Petition
While this appeal was pending, we granted James's motion to temporarily remand the matter for the Family Part to hear and decide his PCR petition.[5] Through this petition, James sought to reverse his adjudication of delinquency and obtain a new trial based on the alleged ineffective assistance of his trial counsel.
In support of this petition, PCR counsel attached a certification from James's trial attorney in which she claimed to have underestimated and misunderstood the nature and complexity of the charges against James, especially the charge based on fourth degree criminal sexual contact.
According to trial counsel, her misperception of the case coupled with her failure to investigate thoroughly the evidence against James rendered her incapable of appreciating the existence of legal grounds to suppress the statements made by the complaining witnesses to the state's investigators, as well as their subsequent trial testimony. She thus argues that, but for her failure to address these issues, this highly prejudicial evidence would have been excluded by the court under State v. Michaels, 136 N.J. 299, 642 A.2d 1372 (1994). The trial court denied James's PCR petition without conducting an evidentiary hearing.
*948 We review a claim of ineffective assistance of counsel under the two-prong test established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and subsequently adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987). First, James must demonstrate that defense counsel's performance was deficient. Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Second, he must show there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
Our Supreme Court has recognized that the reliability of a child's in-court testimony may be undermined by improper interrogation techniques that can distort a child's recollection of events. Michaels, supra, 136 N.J. at 312, 642 A.2d 1372. A trial court is required to conduct a pretrial taint hearing if a defendant, or in this case a juvenile, makes a showing of "some evidence" that the statements of a child complaining witness were the product of suggestive or coercive interview techniques. Id. at 320, 642 A.2d 1372 (quoting Watkins v. Sowders, 449 U.S. 341, 350, 101 S.Ct. 654, 659, 66 L.Ed.2d 549, 557 (1981) (Brennan, J., dissenting)).
Sufficient grounds to justify a taint hearing include, but are not limited to, interrogative practices such as "the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of defendant, ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions." Id. at 321, 642 A.2d 1372.
If a defendant establishes sufficient evidence of unreliability, the burden shifts to the State to prove by clear and convincing evidence that, in the totality of the circumstances, the statement and proffered testimony "retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques." Id. at 321, 642 A.2d 1372.
At a N.J.R.E. 104 hearing, the State may call experts regarding the suggestive capacity of the procedures employed, and it may demonstrate the reliability of the proffered testimony by independent indicia of reliability. Id. at 321-22, 642 A.2d 1372. The court must determine whether the questioning, "examined in light of all relevant circumstances, gives rise to the substantial likelihood that the child's recollection of actual events has been irremediably distorted and the statements and the testimony concerning those events are unreliable." Id. at 322, 642 A.2d 1372.
A competent criminal defense attorney is expected to be familiar with the legal principles articulated by the Court in Michaels. Confronted with the allegations made by the State against this juvenile, a competent defense attorney would have investigated the methods used by law enforcement officials to interview the two complaining witnesses. James's trial counsel's failure to challenge the admissibility of the complaining witnesses' testimony under Michaels meets the first prong of the Strickland/Fritz test.
The second prong of the Strickland/Fritz test requires James to show that, but for counsel's errors, the result of the delinquency trial would have been different. In her certification in support of James's PCR petition, trial counsel gave the following description of the investigative techniques employed by the State in questioning the complaining witnesses:

*949 On the day of the incident in question, two juvenile victims appeared at the police station to be interviewed. Incredibly, the police did not interview these two sixth grade juveniles separately. After the trial of this matter, after speaking with my successor attorney, I realized how unorthodox and contrary to good police and/or court practice this was. Two young juveniles indicated on the tape that they had, together with their parents, discussed the incident at length for between one half hour and two hours before coming to the police station. As the police conducted the interview of both of these juveniles simultaneously, the juveniles interrupted each other, spoke over each other, and corrected each other. By interviewing these two young boys together, the police failed to follow the most basic rule of witness interview; witnesses must be kept separate so that they cannot influence each other's version of events.
Although Rule 3:22-1 does not require evidentiary hearings to be held on PCR petitions, Rule 3:22-10 confers upon the court the discretion to conduct such hearings because claims of ineffective assistance of counsel often require consideration of evidence that lies outside the trial record. State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992). This is such a case.
Here, the State must be afforded the opportunity to rebut and otherwise contest trial counsel's allegations concerning how the complaining witnesses were interviewed. This can be accomplished through the sworn testimony, subject to cross-examination, of the investigators who conducted these interviews and by the court reviewing the witnesses' taped statements. Of course, the court has the discretion to determine the scope of the hearings, including who should be permitted to testify. The record developed through this process should be sufficient to determine whether, but for trial counsel's inadequate performance, the outcome of the trial would have been different.
We are thus compelled to reverse the trial court's ruling denying James's PCR petition and remand this matter for the court to conduct a Preciose hearing through which evidence of the kind discussed in Michaels can be presented for the court's review and ultimate determination.

VI

Daniel's Guilty Plea
After consulting with counsel of his choice and discussing the matter with his parents, Daniel agreed to plead guilty. The following colloquy occurred before the start of the plea hearing:
THE COURT: [W]hat is the plea offer[?]
....
PROSECUTOR: We have one year's probation, 50 hours community service, a psychosexual evaluation and treatment as recommended ifor if recommended by Probation. No contact with the victim. It's going to be a Megan's Law registry. There will be truthful testimony at trial, if necessary, against his co-defendant, and standard minimum penalties and fines, fingerprinting and DNA samples....
DEFENSE COUNSEL: That's my understanding, your Honor.
[(Emphasis added).]
The plea hearing began immediately thereafter in which the following exchange occurred between the court, Daniel, and defense counsel:

*950 THE COURT: All right. Thank you. have you discussed with [Daniel] his decision to plead guilty?
DEFENSE COUNSEL: I have, your Honor. I have, your Honor.
THE COURT: Are you satisfied that he's doing so freely and voluntarily?
DEFENSE COUNSEL: I am, sir.
THE COURT: Have you told him that by pleading guilty, he's giving up his right to a trial, his right to confront witnesses and the presumption of innocence?
DEFENSE COUNSEL: Yes, your Honor.
THE COURT: Have you also told him that although there is no detention called for under this agreement, and there will be none at this timeor at the time of disposition, that if while he's on probation, if he commits another offense or he violates the conditions of probation, he will be brought back to me for a new disposition on these matters, and at that time, could be required to go to detention for up to 60 days or even Jamesburg for up to two years.
DEFENSE COUNSEL: He's aware of that, your Honor.
THE COURT: Do you understand that, [Daniel]?
DANIEL: Yes, your Honor.
....
THE COURT: Have you also told him that he's required to submit a DNA sample that will be used by law enforcement for future criminal investigations, and he has to pay the cost of that?
DANIEL: Yes, you Honor.
After reviewing the charges Daniel had agreed to plead guilty to, the court elicited the following factual basis from Daniel:
THE COURT: ... Who was involved with you in all of this?
DANIEL: [James and two other fourteen-year-old boys.]
....
THE COURT: And did you know [W.R.] and [O.D.] before that day?
DANIEL: Not personally.
THE COURT: Did any one of the co-juveniles know [W.R.] or [O.D.] before that day?
DANIEL: Yes, sir.
....
THE COURT: And what happened?
DANIEL: We got into an argument with the boys, and then we went to the basketball courts, and weone of the boys pinned them downpinned [W.R.] down, and pulled their pants down, and we put our butts in their face.
THE COURT: And you what?
DANIEL: We put our butts in their face.
THE COURT: What about [O.D.]?
DANIEL: I'm not sure. He was right next to [W.R.], though.
THE COURT: And what was done to [O.D.]?
DANIEL: The same thing.
THE COURT: So it was done not only to [W.R.], but also the same thing was done to [O.D.]?
DANIEL: Yes.
THE COURT: And was eitherwas force used in the process of doing this?
DANIEL: Yes.
THE COURT: In what way?
DANIEL: Holding them down.
THE COURT: Who held them down?
DANIEL: [Another fourteen-year-old boy.]
THE COURT: Who pulled their pants down?
DANIEL: [James] and I.
....

*951 THE COURT: Okay. For both of them?
DANIEL: No, we didn't pull their pants down.
THE COURT: You mean your own pants down.
DANIEL: Yes.
THE COURT: So you and [James] pulled your own pants down.
DANIEL: Yes.
THE COURT: And put your backside into their face?

DANIEL: Yes.

....
PROSECUTOR: With regards to this assault, when you guys took your pants down, you basically put your butts up to their face or on their face. Correct?

DANIEL: Yes.

PROSECUTOR: And all while they were being held down by [another fourteen-year-old boy]. Correct?
DANIEL: Yes.
PROSECUTOR: ... You guys were fourteen years old at the time. Right?
DANIEL: Yes.
PROSECUTOR: And they were about eleven years old. Right?
DANIEL: I think so.
PROSECUTOR: And at some point previous to that, they had been yelling obscenities at you, insulting you
DANIEL: Yes.
PROSECUTOR: And stealing your stuff or taking your items
DANIEL: Yes.
PROSECUTOR: Such as your scooters and stuff like that. And this was in retaliation for that, basically?
DANIEL: Yes.
....
THE COURT: Why did you put your backside in their face?

DANIEL: I'm not really sure, your Honor.

THE COURT: Well
DEFENSE COUNSEL: You mean motive or intent. Whatever your motive was, you understand that by doing so, it was your intention to humiliate, embarrass, or degrade the boys. Correct?

DANIEL: Yes.

....
DEFENSE COUNSEL: And you know what the words "humiliate" and "degrade" mean. Correct?
DANIEL: Yes.
DEFENSE COUNSEL: In fact, we talked about that right in the conference room in the office, correct?
DANIEL: Yes.
DEFENSE COUNSEL: So we're talking about in terms of your purpose, that was your purpose. Correct?
DANIEL: Yes.
....
PROSECUTOR: And you saw [James] do this also.
....
And as a matter of fact, he had done this first? Right?
DANIEL: Yes.
PROSECUTOR: And then you followed after.
DANIEL: Yeah.
[(Emphasis added).]
The only reference to the registration requirements under N.J.S.A. 2C:7-2b(2) reflected in this record is the oblique and cryptic remark made by the prosecutor to the trial judge before the commencement of the plea hearing.

*952 VII

Voluntariness of the Plea
Daniel argues that his guilty plea should be vacated because he was not informed of the ramifications of the requirement that he register under Megan's Law. Although the trial court erred by not addressing Daniel directly at the plea hearing concerning the Megan's Law consequences of his plea, on this record we cannot determine whether this warrants permitting Daniel to withdraw his guilty plea.
In accepting a guilty plea in a juvenile delinquency proceeding, a Family Part judge is obligated
to determine by inquiry of [the juvenile] and others, in the court's discretion, that a factual basis exists for the plea and that the plea is being made voluntarily, not as the result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea.

[R. 5:21A (emphasis added).]
The requirement that a guilty plea be knowing and voluntary obligates the court to ensure that a defendant (or in this case a juvenile) fully understands any consequences that are "direct" or "penal." State v. Johnson, 182 N.J. 232, 236, 864 A.2d 400 (2005). For example, community supervision for life under N.J.S.A. 2C:43-6.4 as a result of a plea of guilty to one of the statute's enumerated sexual crimes is a penal consequence. State v. Jamgochian, 363 N.J.Super. 220, 224, 832 A.2d 360 (App.Div.2003). Although a trial court need not inform a defendant of all of the ramifications of community supervision for life before it accepts a plea, id. at 227, 832 A.2d 360, the judge must take the steps necessary to ensure that a defendant fully understands the parameters of the plea.
In terms of determining whether the registration requirements of N.J.S.A. 2C:7-2 constitute a "penal consequence," we discern no meaningful distinction between it and the community supervision for life requirements of N.J.S.A. 2C:43-6.4. Both statutes significantly curtail a person's liberty interest and carry the sanction of imprisonment for its violation. An individual required to register under N.J.S.A. 2C:7-2 may also be required to, among other things, notify a post-secondary school which he or she attends or is employed by of his or her offender status (N.J.S.A. 2C:7-2c(7)), and inform law enforcement as to whether he or she has "routine access to or use of a computer or other device with Internet capability" (N.J.S.A. 2C:7-2d(2)). Thus, the mere uttering of the Megan's Law label is not sufficient to fully inform a defendant of the consequences of a guilty plea triggering the registration requirements of N.J.S.A. 2C:7-2. See State v. J.J., 397 N.J.Super. 91, 99, 935 A.2d 1252 (App. Div.2007), appeal dismissed, 196 N.J. 459, 957 A.2d 1169 (2008).
Here, the record is clear that the judge who presided over the plea hearing did not address Daniel directly on this critically important aspect of his guilty plea. The only reference to the registration requirements of N.J.S.A. 2C:7-2 in the record is an isolated and fleeting remark made by the prosecutor to the judge before the commencement of the plea hearing that this was "going to be a Megan's Law registry." This cryptic utterance is insufficient to apprise a juvenile of the lifelong penal consequences resulting from an adjudication of delinquency triggering the registration requirements of N.J.S.A. 2C:7-2.
We also find problematic that this plea was taken by the court without requiring the juvenile to complete the plea form *953 prescribed by the Administrative Director of the Court.[6] Although the language in Rule 5:21A does not obligate the court to require the juvenile to complete this form, this is the type of case in which completing the form could have at least given the court and the parties some indication of the issues that needed to be addressed at the plea hearing.
The form (attached here as exhibit C-1) includes a supplemental questionnaire for certain sexual offenses and apprises the juvenile and his or her parents or guardians of the requirements to register with certain governmental and law enforcement agencies if the guilty plea triggers an adjudication of delinquency based on any of the specifically listed offenses, including criminal sexual contact. Although the use of the form does not relieve the court of its obligation under Rule 5:21A to address the juvenile directly, it would have acted here as a fail-safe reminder of the need to have these issues addressed at the plea hearing. We thus encourage Family Part judges to use this officially sanctioned form as both a means of conveying vital information to the litigants and as a prophylactic measure against errors by omission.
Returning to the question at hand, we are compelled to remand this matter for a hearing in which the trial court will determine whether Daniel should be permitted to withdraw his guilty plea on the offense of criminal sexual contact because he was not informed of the penal consequences arising from the registration requirements of Megan's Law. At this hearing, Daniel must demonstrate how the omission of information about the registration requirements under N.J.S.A. 2C:7-2 "materially affected his decision to plead guilty." Johnson, supra, 182 N.J. at 244, 864 A.2d 400.
If, on remand, the court determines that the plea must be vacated, Daniel will have three options: (1) renegotiate the plea agreement, if the State is willing to do so; (2) withdraw his guilty plea and proceed to trial; or (3) withdraw the motion to vacate the plea and accept the original sentence. Ibid. citing State v. Kovack, 91 N.J. 476, 485, 453 A.2d 521 (1982)).

VIII

Conclusion
As to James, his adjudication of delinquency based on fourth degree criminal sexual contact is held in abeyance pending the outcome of an evidentiary hearing. At this hearing, the trial court will determine whether, but for James's trial attorney's failure to challenge the admissibility of the testimony of the two complaining witnesses, there is "a reasonable probability" the result of the proceeding would have been different. Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. If the court finds in favor of the State, the adjudication of delinquency is otherwise affirmed.[7] If the court finds for the juvenile, the court must vacate the adjudication of delinquency and schedule the matter for a new trial or for such other proceedings as may be warranted.
As to Daniel, the matter is remanded for a hearing in which the court *954 must determine whether he was fully informed of the consequences of his guilty plea under Megan's Law. The court must also determine whether the registration requirements under N.J.S.A. 2C:7-2 materially affected Daniel's decision to plead guilty.
Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

*955 
*956 
*957 
NOTES
[1] See In Re Registrant J.G., 169 N.J. 304, 339, 777 A.2d 891 (2001) (noting registration requirements terminate at age eighteen only "for adjudicated delinquents whose sex offenses were committed prior to age fourteen and who prove by clear and convincing evidence that they are not likely to pose a threat to the safety of others").
[2] A slang term for a small penis.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Although some may consider this part of our opinion as merely dicta without precedential value, we emphasize that "the legal findings and determinations of a high court's considered analysis must be accorded conclusive weight by lower courts." State v. Rose, 206 N.J. 141, 183, 19 A.3d 985 (2011) (citing State v. Breitweiser, 373 N.J.Super. 271, 282-83, 861 A.2d 176 (App.Div.2004), certif. denied, 182 N.J. 628, 868 A.2d 1031 (2005)).
[5] Although characterized as a post-conviction relief petition, James's ineffective assistance of counsel claim does not technically comport to the standards for such relief because post-conviction relief is a means to challenge a final judgment of conviction on grounds that could not have been raised on direct appeal. State v. McQuaid, 147 N.J. 464, 482-83, 688 A.2d 584 (1997). A conviction is deemed "final" only when all avenues of direct appeal have been exhausted. State v. Jenkins, 221 N.J.Super. 286, 290-91, 534 A.2d 421 (App. Div.1987), certif. denied, 113 N.J. 343, 550 A.2d 456 (1988), cert. denied, 488 U.S. 1032, 109 S.Ct. 843, 102 L.Ed.2d 975 (1989). James's adjudication of delinquency is not yet final because he has not exhausted all avenues of direct appellate review. Despite this technical deficiency, we are satisfied that the petition presents a cognizable claim of ineffective assistance of counsel that is ripe for appellate review.
[6] A footnote in Daniel's appellate brief states "[t]he parties do not appear to have entered into a written plea agreement," and notes that the State's plea offer was presented originally in a letter and then placed on the record.
[7] At this point, James would have the right to appeal the trial court's ruling.